# TAMARA DORFMAN *v.* JOSCELYN M. SMITH
## (SC 20556)

Robinson, C. J., and McDonald, D'Auria,
Ecker and Keller, Js.

*Syllabus*

The plaintiff appealed from that part of the trial court's judgment dismissing
her claims against the defendant insurance company for breach of the
implied covenant of good faith and fair dealing, negligent infliction
of emotional distress, and violation of the Connecticut Unfair Trade
Practices Act (CUTPA) (§ 42-110a et seq.) based on a violation of the
Connecticut Unfair Insurance Practices Act (CUIPA) (§ 38a-815 et seq.).
The plaintiff had been involved in a motor vehicle collision with J, one
of the defendant's insureds. The plaintiff thereafter filed a claim with
the defendant under the underinsured motorist provision of her policy.
The defendant investigated the claim, concluded that J was 100 percent
at fault and made notations of its findings in the claim file. The defendant
then notified the plaintiff that her right to pursue her claim was condi-
tioned on her provision of an affidavit of no excess insurance. The
plaintiff subsequently brought the present action. The defendant hired
attorneys to represent it in connection with the plaintiff's action but
deliberately withheld from them its file notes, which included the
recorded statement and identity of a witness to the collision, even though
the defendant knew that information was necessary for its attorneys to
prepare accurate responses to the plaintiff's complaint and discovery
requests. The defendant pleaded in its answer to the plaintiff's complaint
that it denied or did not have sufficient information to admit the plaintiff's
allegations regarding the cause of the collision and her injuries, and
asserted a special defense of contributory negligence, even though it
knew that it was without a basis in fact. The defendant also provided
false responses to the plaintiff's discovery requests, including that it did
not know of the existence of the witness to the collision or whether any
recorded statements of witnesses existed. In the plaintiff's deposition
of the defendant, the defendant's designee admitted that the defendant
had been aware of the witness to the collision and his recorded statement
but failed to disclose that information in its interrogatory responses.
The designee also indicated that the defendant did not single out the
plaintiff for special or unique treatment when it conditioned her receipt

Dorfman *v.* Smith

of underinsured motorist benefits on the provision of an affidavit of no excess insurance and when it provided false responses to her discovery requests. The defendant admitted liability with respect to the plaintiff's breach of contract claim, and the plaintiff was awarded damages in connection therewith. In dismissing the plaintiff's claims of breach of the implied covenant of good faith and fair dealing and negligent inflection of emotional distress, however, the trial court concluded that those claims were barred by the litigation privilege because they were predicated on communications and statements made in the course of and related to a judicial proceeding. The court also concluded that the litigation privilege applied to the plaintiff's allegations regarding the defendant's purported business practice of responding falsely to discovery requests and dismissed that portion of the plaintiff's CUTPA claim. The court nevertheless determined that the litigation privilege did not bar the plaintiff's CUTPA claim to the extent that the plaintiff alleged that the defendant maintained an improper business practice of conditioning the receipt of underinsured motorist benefits on the provision of an affidavit of no excess insurance, which purportedly was in violation of statute (§ 38a-336c (c)). The Appellate Court dismissed the plaintiff's initial appeal for lack of a final judgment. The plaintiff then amended her complaint to remove all allegations regarding the defendant's purported violation of § 38a-336c (c), and the trial court rendered judgment for the plaintiff on her breach of contract claim and for the defendant on the plaintiff's extracontractual claims, from which the plaintiff appealed. *Held*:

1. The trial court correctly determined that the litigation privilege barred the plaintiff's claim of breach of the implied covenant of good faith and fair dealing: the plaintiff's claim that the defendant systemically abused the judicial process challenged the defendant's conduct in defending against her underinsured motorist claim, rather than the purpose of the underlying judicial proceedings, and her claim was similar to a defamation claim, to which the litigation privilege generally applies, insofar as it was premised on the communication of false statements in pleadings and other documents related to litigation; moreover, the fact that the defendant made the allegedly false communications to its attorneys rather than in court or directly to the court or to an opposing party did not limit the application of the litigation privilege, as the defendant's communications to its attorneys led to misrepresentations and deceptive answers in pleadings and documents that had been filed during the course of litigation; furthermore, although the plaintiff asserted that the bad faith element of a claim of breach of the implied covenant of good faith and fair dealing was equivalent to the malicious intent element of a vexatious litigation claim, to which the litigation privilege generally does not apply, a complete definition of bad faith demonstrated that the plaintiff's good faith and fair dealing claim was more akin to a claim of fraud, to which courts have applied the litigation

Dorfman *v.* Smith

privilege, the fact that the plaintiff's claim involved dishonesty did not make it akin to a claim of vexatious litigation, and the fact that the plaintiff alleged facts that may have been sufficient to support a vexatious litigation claim did not prevent the litigation privilege from applying to the claim she actually alleged; in addition, to the extent that the plaintiff claimed that the common-law immunity afforded to knowingly false communications made during judicial proceedings was abrogated by statute (§ 52-99) or that public policy disfavored immunity under these circumstances, those claims were unavailing, and there existed safeguards other than civil liability to deter or preclude misconduct or to provide relief from the defendant's alleged misconduct.

2. The trial court properly applied the litigation privilege to the plaintiff's claim of negligent infliction of emotional distress, and, accordingly, that claim was properly dismissed; the plaintiff's allegations in support of that claim incorporated the same allegations she made in support of her claim of breach of the implied covenant of good faith and fair dealing and also were premised on communications that the defendant made during and relevant to the underlying judicial proceeding.

3. The plaintiff's claim that the defendant violated CUTPA based on a violation of CUIPA was barred by the litigation privilege: the litigation privilege bars CUTPA claims, like the claim at issue, premised solely on general allegations of intentionally false discovery responses made by an insurer during and relevant to a judicial proceeding because those claims merely challenge the making of false statements; moreover, there were no allegations in the plaintiff's complaint that the defendant's misconduct occurred with such frequency as to constitute a statutorily (§ 38a-816 (6)) prohibited general business practice, as her allegations regarding that conduct were limited to the defendant's conduct in the present case; furthermore, although the business practice of misrepresenting facts relating to insurance coverage issues is prohibited by § 38a-816 (6), CUIPA did not abrogate absolute immunity for conduct allegedly in violation of that statute, as CUIPA does not impose liability for such conduct by imposing a private right of action but, instead, limits the remedy under that act to administrative action by the Commissioner of Insurance, that remedy was available to the plaintiff, and the legislature could have explicitly abrogated the immunity afforded by the litigation privilege for violations of that statute but did not.

(*One justice concurring in part and dissenting in part*)

Argued April 28, 2021—officially released March 29, 2022

*Procedural History*

Action to recover damages for injuries sustained as a result of the named defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the court,

Dorfman *v.* Smith

*Robaina, J.*, granted the plaintiff's motion to add Liberty Mutual Fire Insurance Company as a defendant; thereafter, the action was withdrawn as against the named defendant; subsequently, the court, *Noble, J.*, granted the motion filed by the defendant Liberty Mutual Fire Insurance Company to bifurcate the trial as to the second count of the operative complaint; thereafter, the second count was tried to the jury before *Noble, J.*; verdict for the plaintiff; subsequently, the court, *Noble, J.*, granted in part the motion to dismiss the remaining counts filed by the defendant Liberty Mutual Fire Insurance Company; thereafter, the plaintiff withdrew the amended complaint in part, and the court, *Noble, J.*, rendered judgment in part for the plaintiff and in part for the defendant Liberty Mutual Fire Insurance Company, from which the plaintiff appealed. *Affirmed.*

*Proloy K. Das*, with whom were *Leonard M. Isaac*, *James J. Nugent*, *Marilyn B. Fagelson* and, on the brief, *Brian Parrott*, for the appellant (plaintiff).

*Philip T. Newbury, Jr.*, for the appellee (defendant Liberty Mutual Fire Insurance Company).

*Opinion*

D'AURIA, J. This appeal requires that we examine the scope of the litigation privilege, which provides absolute immunity from suit, in relation to alleged misconduct by an insurance company. The plaintiff, Tamara Dorfman, appeals from that part of the trial court's judgment dismissing her claims against the defendant Liberty Mutual Fire Insurance Company for breach of the implied covenant of good faith and fair dealing, negligent infliction of emotional distress, and violation of the Connecticut Unfair Trade Practices Act (CUTPA); General Statutes § 42-110a et seq.; based on a violation of the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq. The trial court dismissed these claims on the ground that the litigation

Dorfman *v.* Smith

privilege deprived the court of subject matter jurisdiction over these claims. The plaintiff argues that, because these claims were the functional equivalent of claims for vexatious litigation, the litigation privilege did not apply. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history, as alleged in the complaint, construed in the light most favorable to the plaintiff, and contained in the record, are relevant to our review of these claims. In 2014, the plaintiff was injured when her motor vehicle collided with a vehicle operated by Joscelyn M. Smith, who failed to stop his vehicle at a stop sign. At the time of the collision, the defendant insured the plaintiff under a contract of motor vehicle insurance, which contained a provision for uninsured-underinsured motorist coverage as required by General Statutes § 38a-336. At the time of the collision, Smith was underinsured, and the plaintiff filed a claim with the defendant under the underinsured motorist provision of her insurance contract.

As part of its general business practices, the defendant investigated the collision to determine the cause and legal responsibility. In investigating the plaintiff's claim, the defendant acquired the police report regarding the collision, the plaintiff's recorded statement, and the recorded statement of Birbahadu Guman, a witness to the collision who was not listed in the police report. The report and the statements all noted Smith's failure to stop at the stop sign. Based on this information, two claims specialists employed by the defendant both concluded that Smith was 100 percent liable for the collision and noted their findings in the claim file. The defendant notified the plaintiff that her right to pursue her claim was conditioned on her providing an affidavit of no excess insurance.

To compel payment of the underinsured motorist benefits, the plaintiff brought suit against the defendant,

Dorfman *v.* Smith

alleging breach of contract.[1] The defendant hired attorneys to represent it in connection with the plaintiff's claim but deliberately withheld from them its file notes regarding the claim, Guman's name and existence, and Guman's recorded statement, even though it knew this information was necessary for its attorneys to prepare accurate responses to the plaintiff's complaint and discovery requests. In answering the complaint, the defendant pleaded that either it denied or did not have sufficient information to admit the allegations that Smith had failed to stop at a stop sign, causing the collision and the plaintiff's resulting injuries. The defendant also asserted a special defense of contributory negligence, even though it knew this to be false. As a result, the plaintiff alleges that the defendant's answer "falsely responded to . . . [the] allegation[s]" in the complaint, in violation of General Statutes § 52-99.

The plaintiff's attorney then noticed the defendant's deposition to address, in part, the factual basis behind its answer and special defense. The defendant moved for a protective order. Additionally, the defendant provided false responses to the plaintiff's discovery requests, including that it did not know of the existence of any witnesses not listed in the police report and whether any recorded statements existed. In further response to the deposition notice, the defendant's corporate designee testified under oath, admitting that "[t]here was no basis in fact for [the defendant's] accusation that [the plaintiff] was in any way responsible for causing the accident" and that the defendant "had known that

[1] In the original complaint, the plaintiff also raised a claim of negligence against Smith but later withdrew it after she settled with Smith for his policy limits. Thus, Liberty Mutual Fire Insurance Company was the only remaining defendant at the time it moved to dismiss the claims at issue—breach of the implied covenant of good faith and fair dealing, negligent infliction of emotional distress, and violation of CUTPA based on a violation of CUIPA. Therefore, we refer to Liberty Mutual Fire Insurance Company as the defendant.

Dorfman *v.* Smith

there was nothing [the plaintiff] could have done to avoid the accident . . . .'' The defendant's designee also admitted that the defendant was aware that Guman had witnessed the accident and made a recorded statement but failed to disclose this information in its interrogatory responses. On the basis of this conduct, the plaintiff alleges that the defendant ''used intentional misstatements, intentional misrepresentations, intentionally deceptive answers, and violated established rules of conduct in litigation,'' and ''knowingly and intentionally engaged in dishonest and sinister litigation practices by taking legal positions that were without factual support'' to try to prevent the plaintiff from receiving the benefits owed to her under the contract.

The defendant's designee also testified under oath that, in addition to this misconduct, ''[the defendant] did not single out [the plaintiff] for special or unique treatment when it conditioned [her] receipt of [underinsured motorist] benefits [on] the provision of an affidavit of no excess insurance but was instead pursuing conduct that Liberty Mutual Corporation routinely takes in its handling of claims from other policyholders as well.'' Similarly, the defendant's designee ''testified under oath that [the defendant] did not single out [the plaintiff] for special or unique treatment when it responded falsely to [her] discovery requests.''

Following this deposition, the trial court granted the plaintiff permission to amend her complaint to include claims for breach of the implied covenant of good faith and fair dealing, negligent infliction of emotional distress, and violation of CUTPA based on a violation of CUIPA. The defendant moved to bifurcate the breach of contract claim from the extracontractual claims, which the trial court granted. Prior to trial on the breach of contract claim, the defendant withdrew its special defense of contributory negligence. At trial on the

Dorfman *v.* Smith

breach of contract claim, the defendant admitted liability, and a jury awarded the plaintiff $169,928.

After the verdict, the defendant moved to dismiss the remaining claims for lack of subject matter jurisdiction on the ground that the litigation privilege barred those claims. The trial court granted the motion in part and denied it in part. Specifically, as to the plaintiff's claims for breach of the implied covenant of good faith and fair dealing and negligent inflection of emotional distress, the trial court held that, because the claims were predicated on communications and statements filed in the course of and related to a judicial proceeding, the litigation privilege applied. For the same reason, as to the plaintiff's claim for violation of CUTPA based on a violation of CUIPA, the trial court determined that the allegations regarding a business practice of responding falsely to discovery requests also were privileged. The trial court determined, however, that, to the extent the plaintiff's CUTPA claim alleged that the defendant maintained an improper business practice of conditioning receipt of underinsured motorist benefits on the provision of an affidavit of no excess insurance, in violation of General Statutes § 38a-336c (c), the litigation privilege did not bar such a claim because this practice did not occur during the judicial proceedings but occurred before the action commenced. Thus, the trial court granted the motion to dismiss except as to the plaintiff's CUTPA claim to the extent it was premised on a violation of § 38a-336c (c).

The plaintiff appealed from the trial court's decision on the defendant's motion to dismiss, but the Appellate Court dismissed the appeal for lack of a final judgment in light of the continued viability of the CUTPA claim. The plaintiff subsequently requested and received permission to amend her complaint to remove all allegations regarding the alleged violation of § 38a-336c (c). Because the alleged violation of § 38a-336c (c) was the

Dorfman *v.* Smith

only claim to have survived the motion to dismiss, the trial court determined that the withdrawal of these allegations effectively withdrew this theory of liability. Accordingly, the court rendered judgment in favor of the defendant on all of the plaintiff's extracontractual claims. The plaintiff then appealed to the Appellate Court. The appeal was then transferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

I

Before addressing the applicability of the litigation privilege, "[w]e begin our analysis with a review of [this] doctrine . . . as set forth in *Simms* v. *Seaman*, 308 Conn. 523, 531–40, 69 A.3d 880 (2013). In *Simms*, we noted that the doctrine of absolute immunity originated in response to the need to bar persons accused of crimes from suing their accusers for defamation. . . . The doctrine then developed to encompass and bar defamation claims against all participants in judicial proceedings, including judges, attorneys, *parties*, and witnesses. . . . We further noted that, [l]ike other jurisdictions, Connecticut has long recognized the litigation privilege, and that [t]he general rule is that defamatory words spoken upon an occasion absolutely privileged, though spoken falsely, knowingly, and with express malice, impose no liability for damages recoverable in an action in slander . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, 310 Conn. 616, 627, 79 A.3d 60 (2013).

Recently, in *Scholz* v. *Epstein*, 341 Conn. 1, 10, 266 A.3d 127 (2021), we recognized the policy rationales underlying this privilege.[2] Although we articulated these

_____

[2] In *Scholz*, we explained that "[t]hree rationales have been articulated in support of the absolute privilege. [*Simms* v. *Seaman*, supra, 308 Conn.] 535. The most important is that the privilege protects the rights of clients who should not be imperiled by subjecting their legal advisors to the constant fear of lawsuits arising out of their conduct in the course of legal representa-

Dorfman *v.* Smith

rationales in relation to a claim brought against an attorney for communications made during a judicial proceeding, we also have relied on these rationales to apply immunity to claims brought against party opponents and witnesses: "[T]he purpose of affording absolute immunity to those who provide information in connection with judicial and quasi-judicial proceedings is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements. . . . [T]he possibility of incurring the costs and inconvenience associated with defending a [retaliatory] suit might well deter a citizen with a legitimate grievance from filing a complaint. . . . Put simply, absolute immunity furthers the public policy of encouraging participation and candor in judicial and quasi-judicial proceedings. This objective would be thwarted if those persons whom the common-law doctrine [of absolute immunity] was intended to protect nevertheless faced the threat of suit. In this regard, the purpose of the absolute immunity afforded participants in judicial and quasi-judicial proceedings is the same as the purpose of the sovereign immunity enjoyed by the state. . . . As a result, courts have recognized absolute immunity as a defense in certain retaliatory civil actions in order to remove this disincentive and thus encourage citizens to come forward with complaints or to testify.'' (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 627–28.

---

tion. . . . Id. [Second, by] affording absolute immunity to those who provide information in connection with judicial and quasi-judicial proceedings [we have recognized] that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements. . . . Id., 539. Additionally, the privilege protects access to the courts inasmuch as retaliatory lawsuits [that might] cause the removal of [an] adversary's counsel would compromise the judicial process, and there exist other remedies, such as the court's contempt powers . . . . Id., 535–36." (Internal quotation marks omitted.) *Scholz* v. *Epstein*, supra, 341 Conn. 10.

Dorfman *v.* Smith

We since have recognized that absolute immunity extends to an array of retaliatory civil actions beyond claims of defamation, including intentional interference with contractual or beneficial relations arising from statements made during a civil action, intentional infliction of emotional distress arising from statements made during judicial proceedings, and fraud against attorneys or party opponents for their actions during litigation. See id., 628; *Tyler* v. *Tatoian*, 164 Conn. App. 82, 92, 137 A.3d 801, cert. denied, 321 Conn. 908, 135 A.3d 710 (2016). This expansion is premised on the rationale that, "because the privilege protects the communication, the nature of the theory [on which the challenge is based] is irrelevant." (Emphasis omitted; internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 628.

This court in *Simms*, however, explained that there are limits to the application of the litigation privilege. See *Simms* v. *Seaman*, supra, 308 Conn. 540–41. Specifically, the litigation privilege does not bar claims for abuse of process, vexatious litigation, and malicious prosecution. Id., 540–42. This is because "whether and what form of immunity applies in any given case is a matter of policy that requires a balancing of interests . . . ." (Citation omitted; internal quotation marks omitted.) Id., 541–42.

Specifically, *Simms* identified the following factors as relevant to any determination of whether policy considerations support applying absolute immunity to any particular cause of action:[3] (1) whether the alleged conduct subverts the underlying purpose of a judicial proceeding in a similar way to how conduct constituting abuse of process and vexatious litigation subverts that

---

[3] These factors, to the extent relevant, apply regardless of whether the action is against an attorney, party opponent, or witness. See *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 630–31.

Dorfman *v.* Smith

underlying purpose; (2) whether the alleged conduct is similar in essential respects to defamatory statements, inasmuch as the privilege bars a defamation action; and (3) whether the alleged conduct may be adequately addressed by other available remedies. Id., 545. Assisting in our evaluation of these factors, to the extent applicable, we have considered as persuasive whether federal courts have protected the alleged conduct pursuant to the litigation privilege. See id., 545–46. These factors and considerations, however, are "simply instructive," and courts must focus on "the issues relevant to the competing interests in each case" in light of the "particular context" of the case.[4] (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 630–31. We are not required to rely exclusively or entirely on these factors, but, instead, they are useful when undertaking a careful balancing of all competing public policies implicated by the specific claim at issue and determining whether affording parties this com-

[4] For example, in *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 630–31, this court held that absolute immunity did not bar a claim of employer retaliation. In *MacDermid, Inc.*, the plaintiff employer filed an underlying action for civil theft, fraud, unjust enrichment, and conversion, premised on the defendant employee's conduct in relation to the employee's workers' compensation claim. See id., 622. The defendant employee then filed a counterclaim, alleging that the plaintiff employer violated General Statutes § 31-290a by initiating the underlying action solely in retaliation for his exercise of his rights under the Workers' Compensation Act, General Statutes § 31-275 et seq. Id. The plaintiff subsequently moved to dismiss the defendant's counterclaim, arguing that the court lacked subject matter jurisdiction over that claim because the doctrine of absolute immunity protects the act of filing an action. Id. In holding that the litigation privilege did not apply to a claim alleging a violation of § 31-290a, we noted that the claim did not include the same stringent requirements and balancing of interests as does a claim of vexatious litigation. Id., 632–33. Nevertheless, we determined that the public policy underlying § 31-290a was similar to the public policy underlying a claim of vexatious litigation. See id., 631, 635; see also part II A of this opinion. Additionally, we relied heavily on the fact that, not only would barring immunity not open the floodgates to retaliatory claims against employers, but providing immunity actually would deter employees from exercising their rights under the act. See id., 625 n.7, 635–36.

Dorfman *v.* Smith

mon-law immunity from this common-law action is warranted.

The plaintiff does not address these factors as to each count the trial court dismissed but, rather, argues generally that counts three, four, and five are not barred by absolute immunity because all three counts are premised on the defendant's improper use of the courts, all three counts are the functional equivalent of a claim for vexatious litigation, to which absolute immunity does not apply, and statutes and case law establish a public policy against applying the litigation privilege to the alleged conduct.

The applicability of absolute immunity implicates the court's subject matter jurisdiction.[5] E.g., *Bruno* v. *Travelers Cos.*, 172 Conn. App. 717, 723, 161 A.3d 630 (2017); cf. *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 787, 865 A.2d 1163 (2005) (like colorable claim of sovereign immunity, to protect against threat of lawsuit, colorable claim of absolute immunity based on participation in judicial and quasi-judicial proceedings gives rise to immediately appealable final judgment). "When a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss . . . a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 626. Whether absolute immunity applies to the causes of action at issue is a question of law subject to de novo review.

---

[5] The parties do not dispute that the doctrine of absolute immunity implicates the trial court's subject matter jurisdiction. The plaintiff, however, argues that, even if absolute immunity applies in the present case, the court retained jurisdiction because it had statutory authority pursuant to § 52-99 and inherent authority to sanction parties for litigation misconduct. See *Maris* v. *McGrath*, 269 Conn. 834, 848, 850 A.2d 133 (2004). We discuss this argument in part II C of this opinion.

Dorfman *v.* Smith

See, e.g., *Simms* v. *Seaman*, supra, 308 Conn. 530. This is consistent with our de novo review of a trial court's ultimate legal conclusion and resulting determination of a motion to dismiss. See, e.g., *MacDermid, Inc.* v. *Leonetti*, supra, 626.

We address in turn each of the plaintiff's arguments as to each dismissed count.

II

The plaintiff's claim for breach of the implied covenant of good faith and fair dealing appears in count three of her complaint. The plaintiff alleged that the defendant falsely responded to the complaint, including by asserting a special defense the defendant knew had no basis in fact, as well as falsely responding to interrogatories and discovery requests. As a result, the defendant "used intentional misstatements, intentional misrepresentations, intentionally deceptive answers, and violated established rules of conduct in litigation," and "knowingly and intentionally engaged in dishonest and sinister litigation practices by taking legal positions that were without factual support in order to further frustrate [the plaintiff's] ability to receive benefits due [to her] under her contract." According to the plaintiff, through this conduct, the defendant (1) engaged in unfair, deceptive, and self-serving conduct, (2) deceitfully and maliciously attributed responsibility for the car crash to the plaintiff, (3) compelled the plaintiff to resort to litigation to obtain her benefits, and (4) filed false and misleading answers in pleadings and discovery responses it knew had no basis in fact to prolong litigation and to attempt to reduce the plaintiff's insurance benefits.

No appellate authority from this state addresses whether absolute immunity protects against this kind of claim. As a result, we must examine our case law, and the policies underpinning it, to determine whether the plaintiff's good faith and fair dealing claim is more

Dorfman *v.* Smith

akin to claims of vexatious litigation and abuse of process, to which this court has not afforded absolute immunity, or to claims of fraud and defamation, to which this court has afforded absolute immunity. We conclude that all factors—those considered in *Simms* and those unique to this case—weigh in favor of applying the litigation privilege to bar the plaintiff's claim in the present case.

A

The plaintiff argues that her claim for breach of the implied covenant of good faith and fair dealing alleges conduct showing that the defendant systemically abused the judicial process and thereby improperly used the courts. "We have . . . recognized a distinction between attempting to impose liability [on] a participant in a judicial proceeding for the words used therein and attempting to impose liability [on] a litigant for his improper use of the judicial system itself." *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 629. "[W]e have refused to apply absolute immunity to causes of action alleging the improper use of the judicial system" but have applied immunity to claims premised on factual allegations that challenge the defendant's conduct in a properly brought judicial proceeding when the cause of action does not require the plaintiff to challenge either the purpose of the underlying litigation or the purpose of a particular judicial procedure. Id. The former involves the improper use of the courts "to accomplish a purpose for which [they were] not designed" and is not protected by the litigation privilege. (Internal quotation marks omitted.) *Simms* v. *Seaman*, supra, 308 Conn. 546. The latter does not involve consideration of whether the purpose underlying the litigation was improper and, thus, is entitled to absolute immunity, even if the plaintiff alleges that the defendant's conduct constituted an improper use of the courts. Id., 546–47. That is to say, it is not enough for the plaintiff to allege that the misconduct at issue constituted an improper use of the judicial

Dorfman *v.* Smith

system, but, rather, the cause of action itself must challenge the *purpose* of the underlying litigation or litigation conduct. See *Tyler* v. *Tatoian*, supra, 164 Conn. App. 93. Additionally, even if the allegations in the complaint are sufficient to support a claim for vexatious litigation or abuse of process but such claims are not raised, these allegations do not remove immunity from a claim that falls within the scope of the litigation privilege. See *Perugini* v. *Giuliano*, 148 Conn. App. 861, 873–74, 89 A.3d 358 (2014).

Thus, in determining whether the plaintiff's claim challenges the purpose of an underlying judicial proceeding, we look at the elements of the claim itself. See *Simms* v. *Seaman*, supra, 308 Conn. 546; see also *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 629, 631. "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, 322 Conn. 385, 399, 142 A.3d 227 (2016).

The plaintiff's claim does not challenge the purpose of any underlying litigation. Rather, her claim challenges the defendant's conduct in defending against her underinsured motorist claim.[6] A claim of breach of the covenant of good faith and fair dealing in general does not challenge the purpose of an underlying judicial pro-

_____

[6] The litigation privilege does not apply to conduct not made in the course of a judicial proceeding. See, e.g., *Fiondella* v. *Meriden*, 186 Conn. App. 552, 563, 200 A.3d 196 (2018), cert. denied, 330 Conn. 961, 199 A.3d 20 (2019). As the master of her complaint, the plaintiff never argued to the trial court— and has not argued before this court—that she premised any of her claims on conduct that occurred outside the course of a judicial proceeding. Rather, she consistently has argued that, during the underlying litigation, the defendant made recovery as difficult as possible and improperly used the courts to avoid paying her the full amount of benefits owed.

Dorfman *v.* Smith

ceeding, like a claim of vexatious litigation or abuse of
process. Additionally, claims regarding good faith and
fair dealing are distinguishable from other claims that
the litigation privilege does not bar. Specifically, in
*MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 631, we
held that the litigation privilege does not apply to claims
alleging a violation of General Statutes § 31-290a, which
prohibits retaliation against employees for exercising
their rights under the Workers' Compensation Act (act),
General Statutes § 31-275 et seq. We emphasized in
*MacDermid, Inc.*, that, like claims for vexatious litiga-
tion and abuse of process, which explicitly hold an
individual liable for the use of the judicial process for
an illegitimate purpose, "§ 31-290a is designed to pre-
vent, or hold the employer liable for, the improper use
of the judicial process for the illegitimate purpose of
retaliating against an employee for his exercise of his
rights under the act. The illegitimate use of litigation
in such a retaliatory manner subverts the purpose of
the judicial system and, as a matter of public policy,
we will not encourage such conduct by affording it
the protection of absolute immunity." Id. The plaintiff's
claim in the present case for breach of the covenant of
good faith and fair dealing is distinguishable from the
claim raised in *MacDermid, Inc.*, in that it is not
designed to hold an individual liable for the improper
use of the judicial system but, rather, is designed to hold
an individual liable for improper conduct in fulfilling
contractual obligations.

The fact that the misconduct at issue allegedly
affected the underlying judicial proceeding does not
alter our analysis. Although the plaintiff's complaint
contains allegations that the defendant, through its liti-
gation conduct, improperly used and abused the judicial
process, unless the plaintiff's cause of action challenges
the purpose of the litigation or litigation procedure,
these allegations do not suffice to establish an improper
use of the judicial system. A claim of abuse of process

Dorfman *v.* Smith

may be premised on the improper use of a particular judicial procedure. But allegations of the improper use of judicial procedure do not satisfy the requirement that the plaintiff's cause of action must itself challenge the purpose of the underlying litigation or litigation procedure. If the concurrence and dissent were correct that the plaintiff's factual allegations were sufficient in the present case to challenge the defendant's use of the courts, any plaintiff could pierce the litigation privilege with any cause of action by merely including allegations that a defendant's conduct constituted an abuse of the judicial system.

As a result, although these allegations do implicate the underlying judicial proceedings, they do not challenge their purpose. Rather than subverting the purpose of the proceedings, the alleged conduct would have rendered the proceeding unfair. As with claims of fraud, although we do not condone such conduct, such unfairness does not bar absolute immunity but, instead, makes clear the importance of the availability of other remedies. See also part II C of this opinion. Thus, the plaintiff's claim for breach of the covenant of good faith and fair dealing does not challenge the purpose of an underlying judicial proceeding.

B

The plaintiff argues that this claim is not only similar to, but is actually the functional equivalent of, a vexatious litigation claim. In considering the plaintiff's arguments, it is helpful to examine how we analyzed a similar argument in *Simms* in relation to a claim of fraud. In *Simms*, this court compared the elements of fraud against the elements of defamation[7] and vexatious

_____

[7] "To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." (Internal quotation marks omitted.) *Simms* v. *Seaman*, supra, 308 Conn. 547–48.

Dorfman *v.* Smith

litigation.[8] In doing so, we looked at whether the plaintiff's fraud claim was premised on communication of a false statement, like a defamation claim; see *Simms* v. *Seaman*, supra, 308 Conn. 548; whether embedded in a fraud claim is a balancing test with stringent safeguards that protect against inappropriate retaliatory litigation while incentivizing the reporting of wrongdoing, like a vexatious litigation claim; id., 549; whether, like a defamation claim, the fraud claim in *Simms* was easy to allege but difficult to prove; id.; and whether, like defamation claims, not recognizing the litigation privilege for such actions would open the floodgates to a wave of litigation. Id., 568. In *Simms*, after considering these arguments, we came down firmly on the side of applying the litigation privilege to a fraud claim against an attorney. See id., 568–69. We conclude similarly in the present case that the plaintiff's claim for breach of the implied covenant of good faith and fair dealing has more in common with a defamation claim than with an abuse of process, vexatious litigation, or malicious prosecution claim, therefore militating in favor of applying the privilege.

The plaintiff's claim for breach of the implied covenant of good faith and fair dealing, like a defamation claim, is premised on the communication of false statements during litigation. See footnote 6 of this opinion. Although the elements of the plaintiff's claim do not specifically mention communications; see part I A of this opinion; we must consider not only the elements of the cause of action but also whether the complaint contains "allegations that a party suffered harm because of a falsehood communicated by the opponent's attor-

_____

[8] "Vexatious litigation requires a plaintiff to establish that: (1) the previous lawsuit or action was initiated or procured by the defendant against the plaintiff; (2) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice; (3) the defendant acted without probable cause; and (4) the proceeding terminated in the plaintiff's favor." *Rioux* v. *Barry*, 283 Conn. 338, 347, 927 A.2d 304 (2007).

Dorfman *v.* Smith

ney.''[9] *Simms* v. *Seaman*, supra, 308 Conn. 548; see also *Bruno* v. *Travelers Cos.*, supra, 172 Conn. App. 728. The allegations in the plaintiff's complaint make clear that she is challenging the defendant's conduct in defending against the underlying underinsured motorist claim. Specifically, her claim is premised on allegations that the defendant used ''intentional misstatements, intentional misrepresentations, [and] intentionally deceptive answers'' to ''knowingly and intentionally [engage] in dishonest and sinister litigation practices by taking legal positions that were without factual support . . . .'' The plaintiff clearly premises her claim in this action on false statements made in pleadings and other documents filed in relation to the breach of contract claim in the underlying action.

This court consistently has held that communications made during and relevant to a judicial proceeding are afforded immunity because ''[w]itnesses and parties to judicial proceedings must be permitted to speak freely, without subjecting their statements and intentions to later scrutiny by an indignant jury, if the judicial process is to function.'' *DeLaurentis* v. *New Haven*, 220 Conn. 225, 264, 597 A.2d 807 (1991). It is well established that ''[t]he privilege extends to pleadings and other papers made a part of a judicial or quasi-judicial proceeding,'' as long as the statements relate sufficiently to issues involved in a proposed or ongoing judicial proceeding; (internal quotation marks omitted) *Hopkins* v. *O'Connor*, 282 Conn. 821, 833, 925 A.2d 1030 (2007); with the test for relevancy described as ''generous . . . .'' Id., 839. This is true even if the communications are false,

_____

[9] As discussed in part II A of this opinion, the fact that the plaintiff alleged that the conduct at issue constituted an abuse of the judicial system does not make the claim at issue akin to a claim for abuse of process. Rather, we look to the plaintiff's factual allegations to determine whether the plaintiff's claim is premised on the communication of false statements. See *Simms* v. *Seaman*, supra, 308 Conn. 548; see also *Bruno* v. *Travelers Cos.*, supra, 172 Conn. App. 728.

Dorfman *v.* Smith

extreme, outrageous, or malicious. See id., 838–39; *Petyan* v. *Ellis*, 200 Conn. 243, 254–55, 510 A.2d 1337 (1986).

To the extent the plaintiff's claim is premised on false statements contained in pleadings and documents related to the litigation—such as the allegedly false statements contained in the defendant's answer, special defense, and discovery responses—the privilege clearly applies. The plaintiff makes no argument that these statements were not related to or made in the course of the litigation of her underinsured motorist insurance claim. This is logical given that a defendant's answer, special defense, and discovery responses clearly are relevant to and made during the underlying litigation.

The plaintiff argues, however, that her claim is not premised on false communications but on misconduct—specifically, that the defendant intentionally withheld information from its attorneys and thus knew that the answer, special defense, and discovery responses were false and had no basis in fact. We are not persuaded. The crux of the plaintiff's claim remains false communications, regardless of how the defendant went about making those false communications. For example, immunity would apply if either (1) the defendant's attorneys had made these statements but knew them to be false, or (2) the defendant, in the underlying litigation, had made these same misrepresentations in the pleadings and discovery responses. See *DeLaurentis* v. *New Haven*, supra, 220 Conn. 264 ("a party . . . is not liable for the words used in the pleadings and documents used to prosecute the suit"); *Petyan* v. *Ellis*, supra, 200 Conn. 251–52 ("it applies to statements made in pleadings or other documents prepared in connection with a court proceeding"); *Alexandru* v. *Strong*, 81 Conn. App. 68, 83, 837 A.2d 875 ("The privilege applies . . . to statements made in pleadings or other documents prepared in connection with a court proceeding. . . . That absolute privilege applies regardless of whether the repre-

Dorfman *v.* Smith

sentations at issue could be characterized as false,
extreme or outrageous.'' (Citations omitted; internal
quotation marks omitted.)), cert. denied, 268 Conn. 906,
845 A.2d 406 (2004). The fact that the defendant made
these misrepresentations to its own attorneys with the
intent that the attorneys would then file false pleadings
and discovery responses does not change the outcome.
The only factual difference in the present case is that
the defendant's attorneys served as intermediaries. The
fact that the defendant did not makes these false com-
munications in court, or directly to the trial court or
an opposing party, does not limit the application of the
privilege. See, e.g., *Hopkins* v. *O'Connor*, supra, 282
Conn. 826 (''the absolute privilege that is granted to
statements made in furtherance of a judicial proceeding
extends to every step of the proceeding until final dispo-
sition''); id., 832 (''[t]he scope of privileged communica-
tion extends not merely to those made directly to a
tribunal, but also to those preparatory communications
that may be directed to the goal of the proceeding'');
*Kenneson* v. *Eggert*, 196 Conn. App. 773, 783, 230 A.3d
795 (2020) (''[t]here is no requirement under Connecti-
cut jurisprudence that to be considered part of a judicial
proceeding, statements must be made in a courtroom
or under oath or be contained in a pleading or other
documents submitted to the court''). The plaintiff's
claim therefore remains premised on the defendant's
communications during and relevant to a judicial pro-
ceeding.

Our Appellate Court has relied on a similar rationale
in applying the litigation privilege to a claim for negli-
gent infliction of emotional distress premised on the
withholding of information. In *Stone* v. *Pattis*, 144 Conn.
App. 79, 96, 72 A.3d 1138 (2013), the plaintiffs alleged
that the defendants conspired to unduly subpoena wit-
nesses, to conceal from the court the reasons for not
calling certain witnesses, and not to disclose certain

Dorfman *v.* Smith

information. The plaintiffs argued that their claim was
premised on deceptive and unfair conduct, not false
communications. See id. The Appellate Court disagreed,
concluding that the alleged conduct constituted "com-
munications made within the context of a judicial pro-
ceeding," even though the false communications were
the result of an alleged conspiracy to withhold informa-
tion. Id., 99.

The present case is similar to *Stone*.[10] The plaintiff's
claim of breach of the implied covenant of good faith
and fair dealing is premised on the defendant's false
communication of information to its attorneys, leading
to misrepresentations and deceptive answers filed in
pleadings and documents during the course of litigation.
That the defendant knew these communications were
false and did not take steps to notify its attorneys of
the truth does not preclude application of the litigation

[10] By contrast, the plaintiff argues that her claim is more analogous to the
claim raised in *Fiondella* v. *Meriden*, 186 Conn. App. 552, 555, 200 A.3d 196
(2018), cert. denied, 330 Conn. 961, 199 A.3d 20 (2019), because both alleged
intentional concealment and deceitful conduct. We disagree. In *Fiondella*,
the defendants successfully brought an action seeking a declaratory judg-
ment that they were the legal owners of a portion of land by operation of
the doctrine of adverse possession. Id. The plaintiffs in *Fiondella*, who were
not parties in the underlying declaratory judgment action, subsequently
brought claims of fraud, slander of title, and civil conspiracy against the
defendants, alleging that the defendants intentionally concealed the declara-
tory judgment action from them, contrary to their property rights and inter-
ests. Id., 559–60. The defendants filed a motion to dismiss on the ground
of absolute privilege, which the trial court granted. Id., 556. The Appellate
Court reversed the trial court's judgment, holding that absolute immunity
did not apply to bar the plaintiffs' claims. In so holding, the Appellate Court
relied on the following facts: (1) the plaintiffs were not parties to or involved
in the underlying declaratory judgment action; (2) the claims were solely
premised on conduct, not communications; and (3) the alleged fraud did
not occur during the pendency of a judicial proceeding between these parties.
See id., 561–62. The Appellate Court emphasized that " '[the privilege]
extends to bar claims of fraud against a party opponent.' " Id., 562. The
present case clearly involves alleged dishonesty of a party opponent. Addi-
tionally, as discussed, the plaintiff's claim is not premised solely on conduct
but on false communications.

Dorfman *v.* Smith

privilege. The accuracy of a statement is irrelevant to
the application of the privilege, even if the defendant
knows the statement is false. See *Simms* v. *Seaman*,
supra, 308 Conn. 548 (" 'because the privilege protects
the communication, the nature of the theory [on which
the challenge is based] is irrelevant' " (emphasis omit-
ted)); *Hopkins* v. *O'Connor*, supra, 282 Conn. 838 (if
"the communications are uttered or published in the
course of judicial proceedings, even if they are pub-
lished falsely and maliciously, they nevertheless are
absolutely privileged provided they are pertinent to the
subject of the controversy"). Thus, the plaintiff's claim
is premised on false communications like a claim for
defamation or fraud.

Additionally, unlike the elements of a claim for vexa-
tious litigation,[11] the elements of a claim for breach of
the implied covenant of good faith and fair dealing lack
any safeguards that balance the need to protect against
inappropriate retaliatory litigation while incentivizing
the reporting of wrongdoing. See footnote 9 of this
opinion. The elements of the good faith and fair dealing
claim at issue require the plaintiff to allege only that
the defendant impeded the plaintiff's right to receive
benefits that she reasonably expected to receive under
the contract and did so in bad faith. See, e.g., *Geysen*
v. *Securitas Security Services USA, Inc.*, supra, 322
Conn. 399.

---

[11] We note that a lack of stringent policy balancing safeguards is not
detrimental to a plaintiff's claim that the litigation privilege does not apply.
See footnote 5 of this opinion. For example, claims of employer retaliation
under § 31-290a and abuse of process do not have these safeguards, but
this court has barred the application of the litigation privilege to those
claims because of other policy considerations. See, e.g., *MacDermid, Inc.*
v. *Leonetti*, supra, 310 Conn. 633 ("the elements of abuse of process, a tort
which also falls outside the scope of absolute immunity, are less stringent
than the elements of vexatious litigation"). The plaintiff's claim is distinguish-
able from claims of abuse of process and employer retaliation, however,
because the plaintiff has not suggested any policy considerations that weigh
in favor of barring the litigation privilege.

Dorfman *v.* Smith

The plaintiff nevertheless argues that this bad faith element is equivalent to the malicious intent element of a vexatious litigation claim, requiring that the defendant acted "primarily for a purpose other than that of bringing an offender to justice"; *Rioux* v. *Barry*, 283 Conn. 338, 347, 927 A.2d 304 (2007); because bad faith is defined as "more than mere negligence; it involves a dishonest purpose." (Internal quotation marks omitted.) This argument misses the mark because the plaintiff does not fully define "bad faith" in the context of a breach of the implied covenant of good faith and fair dealing claim. This court has explained that, in relation to such a claim, "[b]ad faith in general implies . . . actual or constructive *fraud*, or a design to *mislead or deceive* another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose." (Emphasis added; internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, supra, 322 Conn. 399–400.

This more complete definition of bad faith demonstrates that this claim is more akin to a claim of fraud, to which our appellate courts have applied the litigation privilege. See *Simms* v. *Seaman*, supra, 308 Conn. 568–69; *Tyler* v. *Tatoian*, supra, 164 Conn. App. 91–92. If a claim of breach of the implied covenant of good faith and fair dealing may be premised on fraud in relation to a contract, and claims of fraud are afforded absolute immunity, it is logical that the immunity likewise extends to claims of breach of the implied covenant of good faith and fair dealing. As to the other ways to establish the element of bad faith—misleading, deceiving, or acting with a sinister or interested motive—such conduct is similar to the requirement of a fraud claim that the defendant knowingly made an

Dorfman *v.* Smith

untrue statement. See *Simms* v. *Seaman*, supra, 548. Additionally, the fact that the plaintiff's claim involves dishonesty does not make it akin to a claim of vexatious litigation. As we explained, the nature of the communications, even if dishonest, false, or malicious, does not affect the applicability of the privilege.

Additionally, the elements of the plaintiff's claim do not include safeguards such as those found in a vexatious litigation claim: for example, that the prior action was brought without probable cause or that it terminated in the plaintiff's favor. The plaintiff does not dispute this. Rather, she argues that she alleged sufficient facts to satisfy the stringent vexatious litigation elements, and, thus, as alleged, her claim is equivalent to a claim for vexatious litigation, including all of its safeguards. Specifically, she argues that her allegation that the defendant knew it had no factual basis to allege the special defense of contributory negligence was the equivalent of alleging a lack of probable cause under a vexatious litigation claim. She also argues that the fact that the underlying claim for breach of contract resulted in a verdict in her favor is the equivalent of an underlying proceeding terminating in her favor.

The question, however, is not whether her factual allegations are similar to the allegations necessary to raise a claim for vexatious litigation but whether the elements of the claim she has alleged provide similar safeguards to balance the competing interests at stake. See *Simms* v. *Seaman*, supra, 308 Conn. 545. The fact that the plaintiff alleged facts that may have been sufficient to support a claim for vexatious litigation does not prevent the litigation privilege from applying to the claim alleged. See *Perugini* v. *Giuliano*, supra, 148 Conn. App. 874–75 (holding that absolute immunity barred claim alleging that defendant attorney engaged in misconduct for purpose of personal financial gain but noting that plaintiff may have been able to, but did

Dorfman *v.* Smith

not, bring abuse of process action). The plaintiff could have, but did not, advance a claim for vexatious litigation.[12]

The plaintiff further argues that her claim is similar to a claim of vexatious litigation because protection of allegedly dishonest conduct does not further the public policy of candor in judicial proceedings but, rather, violates the state's public policy against untrue allegations or denials in the course of litigation, as evidenced by § 52-99 and case law granting courts the inherent power to sanction parties for litigation misconduct. It is not clear whether the plaintiff is arguing that § 52-99 and our existing case law abrogate the litigation privilege in relation to knowingly false communications or that § 52-99 and our existing case law manifest a public policy against immunity under these circumstances.

To the extent the plaintiff is attempting to argue that § 52-99 abrogates the common-law absolute immunity afforded for knowingly false communications made during and relevant to judicial proceedings, we disagree. Section 52-99 provides in relevant part: "Any allegation or denial made without reasonable cause and found untrue shall subject the party pleading the same to the payment of such reasonable expenses, to be taxed by the court, as may have been necessarily incurred by the other party by reason of such untrue pleading . . . ."

---

[12] By arguing that her claim is equivalent to a claim of vexatious litigation, the plaintiff appears also to be arguing that she did in fact sufficiently allege a vexatious litigation claim and that this court should not be bound by how she labeled the counts in her complaint. We are not persuaded. Although it is true that, for purposes of a motion to strike, our trial courts consistently have relied on the factual allegations of a count, and not the label placed on the count, in determining whether a claim has been sufficiently alleged; see, e.g., *Penney* v. *Holley*, Docket No. CV-14-6010281-S, 2015 WL 1587981, *2 (Conn. Super. March 13, 2015); the plaintiff's complaint cannot reasonably be interpreted as raising a vexatious litigation claim, especially as, during argument on the motion to dismiss, the plaintiff never argued that she was raising a vexatious litigation claim but, rather, argued only that the claims were similar to a vexatious litigation claim.

Dorfman *v.* Smith

"In determining whether . . . a statute abrogates or modifies a [common-law] rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope. . . . Although the legislature may eliminate a [common-law] right by statute, the presumption that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed." (Internal quotation marks omitted.) *Hopkins* v. *O'Connor*, supra, 282 Conn. 843. Section 52-99 contains no such clear and plain expression.

To the extent the plaintiff is arguing that public policy disfavors immunity under these circumstances, we disagree. If anything, as discussed more in part II C of this opinion, § 52-99 demonstrates that other remedies exist for addressing and disincentivizing the alleged conduct. Additionally, our case law does not support a public policy disfavoring immunity for false pleadings but, to the contrary, manifests, as discussed, a policy in favor of immunizing communications made during and relevant to litigation, even if they are intentionally false and malicious. The cases the plaintiff cites in support of her public policy argument either are vexatious litigation and abuse of process cases—causes of action that were not alleged in the present case—or do not involve the litigation privilege.

Our conclusion does not, as the plaintiff argues, render § 52-99 useless because parties may seek sanctions for litigation misconduct under this statute. Our holding means only that this statute does not support the plaintiff's bringing of a private right of action premised on this conduct. For this reason, there is no merit to the plaintiff's argument that, because § 52-99 and the court's inherent authority authorize the court to sanction parties for litigation misconduct, the court retains subject matter jurisdiction over these claims despite the litiga-

Dorfman *v.* Smith

tion privilege. The lack of jurisdiction over the present claim did not prevent the parties from pursuing sanctions under § 52-99 or the court's inherent authority.

The plaintiff also fails to recognize that, unlike § 52-99, the purpose of the litigation privilege is not to prohibit dishonesty but to protect against retaliatory claims that are easily alleged but difficult to prove, like claims premised on dishonesty. See, e.g., *Simms* v. *Seaman*, supra, 308 Conn. 539–40, 549. Like a claim of fraud or defamation, which, likewise, involves dishonesty and false communications, it is easy to allege, but more difficult to prove, that a defendant intentionally made misrepresentations and advanced false allegations in pleadings. Although there is some evidence in the present case that the defendant had no basis to assert the special defense of contributory negligence, this kind of evidence—what a party knew and when—is difficult to prove. Withholding immunity as to the claim at issue has the potential to open the floodgates to retaliatory actions every time a plaintiff prevails in an underlying action in which the defendant raised an unsuccessful special defense or made an allegation in a pleading that was at odds with the verdict.

This possibility of retaliatory litigation is made clear by the plaintiff's own argument before the trial court. There, the plaintiff suggested that, in regard to such claims, a hearing is required to determine jurisdiction because these claims are actionable only if there was no basis in fact for the defendant's special defense. Although no hearing was in fact held in the present case, and the plaintiff argues on appeal that the record is sufficient to establish that the defendant had no basis in fact for its special defense based on the deposition of its representative, the plaintiff's argument shows the weakness of her position before this court. If a claim for breach of the implied covenant of good faith and fair dealing is exempt from immunity only if there was

Dorfman *v.* Smith

evidentiary support for the allegation that the defendant knew its statement had no basis in fact, and a "jurisdictional" hearing would have to be held to determine this preliminary issue, then individuals will be forced to defend themselves in these hearings against retaliatory claims. Such a procedure is in direct conflict with the purpose of the litigation privilege—to ensure "the proper and efficient administration of justice"; *Hopkins* v. *O'Connor*, supra, 282 Conn. 839; and to protect individuals from "incurring the costs and inconvenience associated with defending a [retaliatory] suit . . . ." (Internal quotation marks omitted.) *Simms* v. *Seaman*, supra, 308 Conn. 539.

Accordingly, the plaintiff's claim for breach of the implied covenant of good faith and fair dealing is more akin to a claim of defamation or fraud.

C

Finally,[13] we consider whether safeguards other than civil liability deter or preclude misconduct or provide relief from the alleged misconduct. See id., 552. This factor is answered by the plaintiff's own arguments, which highlight other such safeguards. First, § 52-99 allows parties to seek monetary sanctions from the trial court for allegations and denials within parties' pleadings made without reasonable cause and found to be untrue. Second, the trial court has the inherent authority to sanction parties for litigation misconduct. See, e.g., *Maris* v. *McGrath*, 269 Conn. 834, 846–48, 850 A.2d 133 (2004); see also *DeLaurentis* v. *New Haven*, supra, 220 Conn. 264 ("[w]hile no civil remedies can guard against lies . . . [p]arties or their counsel who behave outrageously are subject to punishment for contempt of the court" (footnote omitted)); *Jaconski* v. *AMF, Inc.*, 208 Conn. 230, 233, 543 A.2d 728 (1988) ("[a]

[13] The parties have not cited any case law from federal or state courts concerning the application of the litigation privilege to a similar claim.

Dorfman *v.* Smith

trial court has the inherent power to provide for the imposition of reasonable sanctions, to compel the observance of its rules''). Further, as we noted in *Simms*, a party may file a motion to open a judgment on the ground that the judgment was obtained by fraud or intentional, material misrepresentation. See *Simms* v. *Seaman*, supra, 308 Conn. 552. In addition, as we noted in *DeLaurentis*, ''[p]arties and their counsel who abuse the process by bringing unfounded actions for personal motives are subject to civil liability for vexatious suit or abuse of process.'' *DeLaurentis* v. *New Haven*, supra, 264. Importantly, in the present case, upon a prior action terminating in her favor, the plaintiff could have brought a lawsuit for vexatious litigation. In fact, that is what she did. These other remedies belie the plaintiff's argument that, if immunity is granted, this court will open the floodgates to insurance companies using the litigation privilege as a loophole to engage in misconduct and deprive insureds of their contractual benefits.

In sum, because the plaintiff's claim for breach of the implied covenant of good faith and fair dealing is premised on false communications, does not challenge the purpose underlying a judicial proceeding, is more akin to a claim for defamation or fraud, and may be addressed by other remedies, we conclude that the trial court properly applied the litigation privilege.

III

For the same reasons, we conclude that the trial court properly applied the litigation privilege to the plaintiff's claim of negligent infliction of emotional distress. Connecticut appellate courts consistently have held that claims of negligent infliction of emotional distress[14]

---

[14] The elements of the tort of negligent infliction of emotional distress are: ''(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.'' *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003).

Dorfman *v.* Smith

premised on communications made during and relevant to an underlying judicial proceeding are afforded absolute immunity. See, e.g., *Bruno* v. *Travelers Cos.*, supra, 172 Conn. App. 719, 727; *Perugini* v. *Giuliano*, supra, 148 Conn. App. 873–74; *Stone* v. *Pattis*, supra, 144 Conn. App. 99–100; see also *Simms* v. *Seaman*, supra, 308 Conn. 569–70 (applying litigation privilege to claim of intentional infliction of emotional distress premised on communication made during and relevant to underlying judicial proceeding).

In the present case, the plaintiff's allegations in support of this claim incorporate the same allegations she made in her claim for breach of the implied covenant of good faith and fair dealing. In light of our holding in *Simms* that that claim is premised on communications made during and relevant to an underlying judicial proceeding, the same analysis and holding apply here. See *Simms* v. *Seaman*, supra, 308 Conn. 570. Accordingly, the trial court properly applied the litigation privilege to the plaintiff's claim for negligent infliction of emotional distress.

IV

The plaintiff's final count, asserting a violation of CUTPA based on a violation of CUIPA, presents a more difficult issue. To address this issue, it is important first to specify the allegations advanced in support of this count. The plaintiff incorporated by reference the allegations she made in support of her claim for breach of the implied covenant of good faith and fair dealing. Additionally, she alleged that the defendant's designee "testified under oath that [the defendant] did not single out [the plaintiff] for special or unique treatment when it responded falsely to [her] discovery requests."[15]

_____

[15] At the time of the defendant's motion to dismiss, the complaint also alleged that the defendant's representative "testified under oath that [the defendant] did not single out [the plaintiff] for special or unique treatment when it conditioned [her] receipt of [underinsured motorist] benefits [on] the provision of an affidavit of no excess insurance . . . ." The trial court

Dorfman *v.* Smith

According to the plaintiff, this business practice violates CUIPA in that the defendant (1) misrepresented facts, (2) failed to adopt and implement reasonable standards for the prompt investigation of claims, (3) refused to pay claims without conducting reasonable investigation, (4) did not attempt in good faith to effectuate prompt, fair, and equitable settlement of claims, and (5) compelled insureds to institute litigation to recover amounts due under an insurance policy.

"CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . To give effect to its provisions, [General Statutes] § 42-110g (a) of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by [General Statutes §] 42-110b . . . . CUIPA, which specifically prohibits unfair business practices in the insurance industry and defines what constitutes such practices in that industry; see General Statutes § 38a-816; does not authorize a private right of action but, instead, empowers the [insurance] commissioner to enforce its provisions through administrative action. See General Statutes §§ 38a-817 and 38a-818. . . . [T]his court [however, has] determined that individuals may bring an action under CUTPA for violations of CUIPA. In order to sustain a CUIPA cause of action under CUTPA, a plaintiff must allege conduct that is proscribed by CUIPA." (Citation omitted; internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 317 Conn. 602, 623–24, 119 A.3d 1139 (2015).

held that absolute immunity did not bar this portion of the plaintiff's CUTPA claim. Because the plaintiff has since withdrawn this portion of the claim, we do not consider it in our analysis.

Dorfman *v.* Smith

Relevant to the present claim, CUIPA prohibits unfair claim settlement practices, which the legislature has defined as "[c]ommitting or performing with such *frequency* as to indicate a general business practice any of the following: (A) [m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue . . . (C) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (D) refusing to pay claims without conducting a reasonable investigation based [on] all available information . . . (F) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (G) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds . . . ." (Emphasis added.) General Statutes § 38a-816 (6). To establish that the improper conduct occurred with "such *frequency* as to indicate a general business practice"; (emphasis added) General Statutes § 38a-816 (6); the plaintiff must allege and establish more than a single act of insurance misconduct. See, e.g., *State* v. *Acordia, Inc.*, 310 Conn. 1, 28, 73 A.3d 711 (2013) ("CUIPA requires 'a showing of more than a single act of insurance misconduct' ").

At oral argument before this court, the plaintiff's appellate counsel, in response to a question, represented that the plaintiff's complaint contained an allegation that the defendant has a business practice of withholding information from its attorneys to ensure false pleadings, as well as a business practice of alleging contributory negligence as a special defense in response to every claim, even if it knows the allegation is false. The plaintiff argued that this alleged conduct was not premised on false communications during and related to judicial proceedings but constituted unfair conduct that CUIPA and CUTPA were specifically designed to protect against.

Dorfman *v.* Smith

If the plaintiff's complaint actually contained such allegations of a general business practice, perhaps this might have been a closer case. But we have scoured the plaintiff's complaint in search of these allegations about the defendant's business practices to no avail. Although there are allegations that, in the plaintiff's particular case, the defendant intentionally concealed information and evidence from its attorneys and alleged the special defense of contributory negligence despite knowing this allegation to be false, there are no allegations in the plaintiff's complaint that this conduct occurred with such frequency as to constitute a general business practice, despite the trial court's having permitted the plaintiff to amend her complaint to include a claimed violation of CUTPA after she learned of the defendant's conduct through discovery. Rather, the plaintiff's allegations regarding this conduct are limited to the defendant's conduct in this case alone.

The plaintiff alleged only that the defendant "did not single [her] out . . . for special or unique treatment when it responded falsely to [her] discovery requests."[16] The plaintiff then alleged that such conduct constituted a general business practice. Even if we assume that these allegations are sufficient to allege that this conduct occurred with such frequency as to indicate a general business practice,[17] the plaintiff's CUTPA claim, as alleged, is barred by the doctrine of absolute immunity under the litigation privilege.

[16] By contrast, in her second amended complaint, the plaintiff set forth more detailed allegations regarding how the defendant had a business practice of conditioning receipt of underinsured motorist benefits on the provision of an affidavit of no excess insurance. Specifically, in addition to alleging that the defendant "did not single out [her] for special or unique treatment," the plaintiff alleged that, in not doing so, the defendant was "pursuing conduct that [the defendant] routinely takes in its handling of claims from other policyholders as well."

[17] The defendant never filed a motion to strike or argued in the alternative that the plaintiff alleged insufficient frequency to establish a business practice in regard to her allegation that the defendant "did not single [her] out . . . for special or unique treatment when it responded falsely to [her] discovery requests." Accordingly, we do not address this issue.

Dorfman *v.* Smith

A business practice of responding falsely to discovery requests, to the extent it involves "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue," is prohibited under CUIPA. General Statutes § 38a-816 (6) (A). The parties have not cited any case law—from this court, the federal courts, or sister state courts—that has addressed whether the litigation privilege applies to claims for violating statutes prohibiting unfair insurance practices. In our own research, we have found only one case addressing this issue. The United States District Court for the Eastern District of Pennsylvania, in *Harrison* v. *Nationwide Mutual Fire Ins. Co.*, 580 F. Supp. 133, 136 (E.D. Pa. 1983), and its progeny, held that, when an unfair insurance practices claim is premised on pleadings or documents filed in and relevant to an underlying judicial proceeding, the conduct is absolutely privileged, even if the statements were made falsely or maliciously.

The plaintiff argues, however, that absolute immunity would undermine the legislative intent of CUIPA, which is to hold insurers accountable for misrepresenting facts relating to coverage issues. In essence, the plaintiff argues that CUIPA abrogates absolute immunity as to the conduct alleged under § 38a-816 (6). Contrary to the plaintiff's argument, CUIPA does not explicitly abrogate absolute immunity. Although § 38a-816 (6) in fact prohibits the business practice of misrepresenting facts relating to coverage issues, CUIPA does not impose liability for this conduct by authorizing a private right of action but, instead, limits the remedy under that act to administrative action by the Commissioner of Insurance. Rather than establishing that immunity should be abrogated, § 38a-816 shows that the legislature prescribed remedies other than civil liability for deterring and curing the alleged conduct, and such remedies are available to the plaintiff in the present case. Additionally, the legislature is aware of both this court's

Dorfman *v.* Smith

precedent regarding the applicability of the litigation privilege to litigation conduct, as well as the various other tools available to the court to regulate and police litigation misconduct. See, e.g., *Chadha* v. *Charlotte Hungerford Hospital*, supra, 272 Conn. 793 n.21 ("the legislature is presumed to be aware of prior judicial decisions involving common-law rules"). If the legislature thought that the particular litigation conduct at issue—filing false discovery responses—had become such a systemic problem that neither the judiciary nor the Commissioner of Insurance has been able to police it, the legislature would have been explicit in abrogating the immunity afforded by the litigation privilege.

Nevertheless, our case law makes clear that an insurer may be held liable under CUTPA for conduct proscribed by § 38a-816 (6). See *Mead* v. *Burns*, 199 Conn. 651, 663, 509 A.2d 11 (1986) ("it is possible to state a cause of action under CUTPA for a violation of CUIPA"). That does not necessarily mean that the legislature intended to abrogate a party's absolute immunity from CUTPA claims based on a business practice of filing false discovery responses. Although there is minimal case law regarding CUIPA and the litigation privilege, there is a wealth of case law regarding CUTPA and the litigation privilege. Courts consistently have applied the litigation privilege to CUTPA claims premised on false communications made during and relevant to an underlying judicial proceeding. See, e.g., *Simms* v. *Seaman*, supra, 308 Conn. 561–62 (discussing federal case law that consistently has held that CUTPA claims premised on false communications made during and relevant to underlying judicial proceeding are barred by litigation privilege); *Bruno* v. *Travelers Cos.*, supra, 172 Conn. App. 722, 727–29 (CUTPA claim against insurance companies was barred by litigation privilege); *Tyler* v. *Tatoian*, supra, 164 Conn. App. 86–87, 93–94 (CUTPA claim against attorney for communications made in course of prior judicial proceeding was barred by litigation privilege).

Dorfman *v.* Smith

These holdings are in line with case law from other jurisdictions, the majority of which have applied the litigation privilege to both common-law and statutory causes of action, including claims for unfair trade practices brought pursuant to the jurisdiction's analogue to CUTPA. See, e.g., *Graham* v. *U.S. Bank, National Assn.*, Docket No. 3:15-cv-0990-AC, 2015 WL 10322087, *16 (D. Or. December 2, 2015) ("Statutory torts are subject to the litigation privilege. Where the Oregon legislature explicitly or implicitly creates a cause of action for violating state law, such a cause of action is a statutory tort [including state law claims for trespass to chattels and under the Oregon Unlawful Trade Practices Act].");  *Trent* v. *Mortgage Electronic Registration Systems, Inc.*, 618 F. Supp. 2d 1356, 1360 (M.D. Fla. 2007) (holding that litigation privilege "precludes communications attached to or made part of a foreclosure complaint from forming the basis of [an unfair trade practices claim]" but does not preclude such a claim premised on presuit communications), aff'd, 288 Fed. Appx. 571 (11th Cir. 2008); *PSN Illinois, Inc.* v. *Ivoclar Vivadent, Inc.*, Docket No. 04 C 7232, 2005 WL 2347209, *6 (N.D. Ill. September 21, 2005) ("the litigation privilege also precludes [the defendant's] deceptive trade practices claim based on statements made in the course of litigation"). But see *Barefield* v. *DPIC Cos.*, 215 W. Va. 544, 554, 600 S.E.2d 256 (2004) ("insurance company's prosecution of a meritless appeal could be used to support a claim for unfair trade practices" (internal quotation marks omitted)).

Under this precedent, the litigation privilege bars CUTPA claims, like the claim at issue, premised solely on general allegations of intentionally false discovery responses because these claims merely challenge the making of false statements. Additionally, there are other remedies available to deter the alleged conduct.[18] See

---

[18] The concurrence and dissent argues that these other remedies are insufficient, especially in light of the unique nature of insurance companies,

Dorfman *v.* Smith

*Tyler* v. *Tatoian*, supra, 164 Conn. App. 93–94. This does not mean, however, that a defendant enjoys absolute immunity from all CUTPA claims under the litigation privilege, even those premised on a violation of CUIPA. Rather, we merely hold that this specific claim—a business practice of filing false discovery responses—is afforded absolute immunity. We recognize that the legislature intended to prohibit certain unfair and deceptive business practices by enacting CUTPA and CUIPA, but the plaintiff has not cited, and we have not discovered, any provision of these statutes that explicitly abrogates the common-law litigation privilege, which, historically, has been applied to false and malicious statements made during and relevant to judicial proceedings. Our holding leaves open the possibility that other CUTPA claims may not be barred by absolute immunity under the litigation privilege. Thus, we conclude that the litigation privilege bars the plaintiff's CUTPA-CUIPA claim.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and McDONALD and KELLER, Js., concurred.

ECKER, J., concurring in part and dissenting in part. The majority concludes that the common-law litigation privilege bars the claims of the plaintiff, Tamara Dorfman, against the defendant Liberty Mutual Fire Insur-

_____

which "are effectively in the business of litigation." First, it is worth noting that this court consistently has applied the litigation privilege to attorneys, who, without a doubt, are in the business of litigation. See *Simms* v. *Seaman*, supra, 308 Conn. 540–45; see also *Imbler* v. *Pachtman*, 424 U.S. 409, 424–29, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976). Moreover, by enacting CUIPA, the legislature has taken explicit action to regulate insurance companies, including by authorizing the Commissioner of Insurance to take administrative action in response to the conduct alleged while not explicitly creating a private right of action. Thus, we are hard-pressed to conclude that the unique status of insurance companies requires, as a matter of public policy, exempting them from the litigation privilege under these circumstances.

Dorfman *v.* Smith

ance Company[1] for breach of the implied covenant of good faith, negligent infliction of emotional distress, and violations of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq. My disagreement stems from the unique features of the present case that distinguish it—starkly, in my view—from any other case yet decided by this court regarding the privilege. The litigation privilege exists to create a protected space for parties to engage in the rough-and-tumble of litigation, uninhibited by fears that their adversary will later file a second generation lawsuit claiming damages for harm caused by the adversary's (or his lawyer's) alleged misconduct in the first case.[2] Except for a narrow category of claims involving misconduct comparable to vexatious litigation or abuse of process, the litigation privilege prevents an aggrieved party from bringing a damages lawsuit for harm caused by litigation misconduct and limits the party's recourse to whatever relief may be obtained from the judge presiding over the litigation or the administrative authority with jurisdiction over the party or lawyer responsible for the misconduct. This judge made policy makes good sense in the ordinary case.

The present lawsuit is nothing like the ordinary case, however, because it arises in a unique context implicating substantially different policy considerations than those that shaped the litigation privilege. The defendant sells automobile liability insurance. It consequently owes its insureds a direct contractual and statutory duty to

---

[1] I refer to Liberty Mutual Fire Insurance Company as the defendant. See footnote 1 of the majority opinion.

[2] The privilege has its origins in the law of defamation and, as such, is concerned with misconduct by spoken or written word. See, e.g., *Simms* v. *Seaman*, 308 Conn. 523, 531–35, 69 A.3d 880 (2013). This qualification does not much limit the scope of the privilege because almost all litigation activity is verbal in nature.

Dorfman *v.* Smith

not act abusively in litigation. Litigation is not an
unusual or occasional activity external to the defen-
dant's business operations but, instead, is an integral
and intrinsic part of its commercial activity—automo-
bile liability claims by their very nature are adjusted,
contested and/or paid either in the shadow of litigation
or in actual litigation. This fact distinguishes the defen-
dant from nearly all other litigants who might claim
protection under the litigation privilege. Indeed, Con-
necticut statutory law recognizes that insurance compa-
nies are fundamentally different from other parties
when it comes to litigation with their insureds. See
General Statutes § 38a-816 (6) (G) (listing as prohibited
unfair claim settlement practice "compelling insureds
to institute litigation to recover amounts due under an
insurance policy by offering substantially less than the
amounts ultimately recovered in actions brought by
such insureds") So, too, our common law recognizes
that an insurer owes its insured a duty of good faith
that would prohibit litigation misconduct in a first-party
action seeking payment under a policy.[3]

Allowing a liability insurer like the defendant to invoke
the privilege in the present case effectively confers an
entire class of commercial enterprises doing business
in Connecticut with immunity from suit by consumers
seeking damages for wrongful and illegal acts under-

___

[3] See 3 L. Russ & T. Segalla, Couch on Insurance (3d Ed. 2011) § 40:7, pp.
40-11 through 40-12 ("The insurer has a duty of good faith and fair dealing
toward the insured. This duty arises out of the special relationship that
exists between the parties because of their unequal bargaining power and
the potential for an insurer to take advantage of an insured's hardships when
negotiating to settle or resolve a claim. . . . When determining whether to
settle a claim, the insurer must give at least as much consideration to the well-
being of the insured as it does to its own interests." (Footnotes omitted.));
see also *Grand Sheet Metal Products Co.* v. *Protection Mutual Ins. Co.*, 34
Conn. Supp. 46, 51, 375 A.2d 428 (1977) (concluding that tort action by
insured against insurer for bad faith is justified in light of "the unequal
bargaining power of the parties, the special nature of the insurance business,
and the disastrous economic effects that a [bad faith] refusal to pay may
cause the insured"). I discuss this point in part II A of this opinion.

342 Conn. 582 MARCH, 2022 623

Dorfman *v.* Smith

taken *as part of their day-to-day business practices.*[4] It could be argued that such a broad immunity is wise policy in light of the competing considerations at play. But, in my view, that conclusion is hardly self-evident, and it certainly is not compelled or even suggested by either our existing precedent or the few statutory tea leaves currently available for guidance.

There are alternatives. One is to defer to the legislature regarding this complex issue of public policy; if a broad immunity is to be extended to insurance companies in this context, it should be conferred by an affirmative act of the legislature upon consideration of all relevant policy implications, not by this court under the rubric of the common-law litigation privilege. Another option, developed at some length in this opinion, is to fashion a more nuanced privilege adapted to cases involving parties, like the defendant in the present case, whose commercial activities involve frequent use of the courts as an integral aspect of their business operations and who are alleged to have breached a contractual, common-law, or statutory duty owed to the plaintiff by engaging in, among other things, litigation misconduct. Indeed, our existing litigation privilege doctrine, properly applied, is well suited to the task. See parts II C and III B of this opinion.

To summarize, the present context is miles away from that in which the litigation privilege was originally formulated, and lies equally distant from the cases in which we have found the privilege applicable to date. The plaintiff is not simply the defendant's adversary; she is its insured. Her lawsuit alleges that the defendant purposely engaged in bad faith insurance claim settlement practices involving both prelitigation and litiga-

---

[4] I am not sure that this is the effect intended by the majority, which seems open to the idea that another case with different facts involving litigation misconduct by an insurance company may fall outside the scope of the privilege. See footnote 17 of this opinion and accompanying text.

Dorfman *v.* Smith

tion misconduct, in violation of its statutory and common-law duties. The pleadings do not allege merely that the defendant has violated the rules of fair litigation owed to one another by all parties to litigation. Rather, the pleadings allege that the defendant insurer has violated a direct, independent contractual and statutory duty owed specifically to the plaintiff-insured. For reasons that I will elaborate on, such allegations, if sufficiently pleaded, should be deemed to fall outside of the litigation privilege under Connecticut law.

I

My concerns focus primarily on two counts of the plaintiff's operative complaint. With respect to the claim for breach of the implied covenant of good faith and fair dealing, I would hold, contrary to the majority's conclusion, that the operative complaint sufficiently alleges conduct outside of litigation that would support a bad faith claim. Specifically, the operative complaint alleges that the defendant insurer was contractually obligated to pay the plaintiff sums that she was legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle for damages resulting from bodily injury, that the defendant knew that it had no valid defense to her claim, and that the defendant nonetheless compelled its insured to resort to litigation and to endure litigation misconduct to obtain payment. To the extent that the plaintiff also alleges bad faith *litigation* conduct, I would conclude that the majority's suggestion that the litigation privilege bars all such claims fails to adequately address the complexity of the law governing such claims, especially as the law applies to first-party claims by an insured against his or her insurer. Particularly in light of the special considerations that arise in the insurance context—most notably, the asymmetry between the insured and the insurer with respect to bargaining power and litigation experience, and the special vulnerabilities of an insured who has suffered a covered loss—I would conclude that this

Dorfman *v.* Smith

claim more closely resembles an abuse of process claim than claims to which we have applied the litigation privilege, such as defamation and fraud, and is sufficient to survive a motion to dismiss. Accordingly, I dissent from part II of the majority opinion.[5]

With respect to the plaintiff's CUTPA claim, I agree that her particular allegations fail to plead a general business practice triggering a CUIPA violation. I therefore concur in part IV of the majority opinion. I write separately to emphasize my view that this limited holding, based on insufficient pleading, in no way requires a similar conclusion were a plaintiff to make more robust allegations of litigation misconduct occurring as part of an insurance company's unfair claim settlement practices under § 38a-816 (6).[6] The majority accurately describes

---

[5] Because the plaintiff's claim of negligent infliction of emotional distress is premised on the conduct that forms the basis of her bad faith claim, I also would conclude that the negligent infliction claim is sufficient to withstand a motion to dismiss. I therefore dissent from part III of the majority opinion, as well.

[6] General Statutes § 38a-816 (6) defines "unfair claim settlement practices" as follows: "Committing or performing with such frequency as to indicate a general business practice any of the following: (A) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (B) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; (C) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (D) refusing to pay claims without conducting a reasonable investigation based upon all available information; (E) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (F) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (G) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; (H) attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; (I) attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured; (J) making claims payments to insureds or beneficiaries not accompanied by statements setting forth the coverage under which the payments are being made; (K) making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose

Dorfman *v.* Smith

the exceedingly weak nature of the plaintiff's CUIPA
based allegations in the present case, acknowledging
that this could be a "closer case" if the plaintiff had alleged
a different CUIPA claim. Part IV of the majority opinion.
I believe that a well pleaded CUIPA/CUTPA claim alleg-
ing unfair claim settlement practices encompassing liti-
gation misconduct would present a very different case
indeed. Whatever the ultimate outcome may be when such
a case presents itself, I feel compelled to explain why we
should exercise care to make sure that our narrow holding
in the present case does not impinge on our ability to
conduct the necessary analysis at that time.

II

A

I first address part II of the majority opinion, in which
the majority concluded that the litigation privilege bars
the plaintiff's claim for breach of the implied covenant
of good faith and fair dealing. I begin with a review of
the governing legal principles. Numerous courts have
recognized that, generally speaking, an insurer has an
obligation to its insureds that goes beyond an ordinary
contractual obligation. See, e.g., *Best Place*, *Inc.* v. *Penn
America Ins. Co.*, 82 Haw. 120, 128, 920 P.2d 334 (1996)
("some courts have emphasized the special relationship

of compelling them to accept settlements or compromises less than the
amount awarded in arbitration; (L) delaying the investigation or payment
of claims by requiring an insured, claimant, or the physician of either to
submit a preliminary claim report and then requiring the subsequent submis-
sion of formal proof of loss forms, both of which submissions contain
substantially the same information; (M) failing to promptly settle claims,
where liability has become reasonably clear, under one portion of the insur-
ance policy coverage in order to influence settlements under other portions
of the insurance policy coverage; (N) failing to promptly provide a reasonable
explanation of the basis in the insurance policy in relation to the facts or
applicable law for denial of a claim or for the offer of a compromise settle-
ment; (O) using as a basis for cash settlement with a first party automobile
insurance claimant an amount which is less than the amount which the
insurer would pay if repairs were made unless such amount is agreed to
by the insured or provided for by the insurance policy."

between insurer and insured, characterized by elements
of public interest, adhesion, and fiduciary responsibil-
ity" (internal quotation marks omitted)); id. (citing cases).
This "special relationship" arises because "[a]n insur-
ance policy is not obtained for commercial advantage;
it is obtained as protection against calamity. [Moreover]
[i]n securing the reasonable expectations of the insured
under the insurance policy there is usually an unequal
bargaining position between the insured and the insur-
ance company. . . . [Finally] the insured is [often] in
an especially vulnerable economic position when such
a casualty loss occurs." (Internal quotation marks omit-
ted.) Id.; see *Reynolds* v. *American Hardware Mutual
Ins. Co.*, 115 Idaho 362, 365, 766 P.2d 1243 (1988) (citing
cases from other jurisdictions); *Arnold* v. *National
County Mutual Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.
1987) ("[i]n the insurance context a special relationship
arises out of the parties' unequal bargaining power and
the nature of insurance contracts which would allow
unscrupulous insurers to take advantage of their insureds'
misfortunes in bargaining for settlement or resolution
of claims"); see also footnote 3 of this opinion.

Although this court has yet to speak on the precise
nature of the duty in the context of first-party (insured
versus insurer) claims,[7] there can be no doubt that insur-
ance contracts impose a duty of good faith and fair
dealing on the insurer that will support an independent
cause of action. See *Buckman* v. *People Express, Inc.*,
205 Conn. 166, 170, 530 A.2d 596 (1987) ("[a]n implied
covenant of good faith and fair dealing has been applied
by this court in a variety of contractual relationships,
including . . . insurance contracts" (internal quota-

---

[7] We have observed in dictum that "an insurer generally has a fiduciary
relationship with its insured." *State* v. *Acordia, Inc.*, 310 Conn. 1, 37, 73
A.3d 711 (2013). But see *Macomber* v. *Travelers Property & Casualty Corp.*,
261 Conn. 620, 641, 804 A.2d 180 (2002) ("[j]urisdictions are split on the
issue of whether an insurer owes a fiduciary duty to its insured; our case
law is silent on this issue").

Dorfman *v.* Smith

tion marks omitted)). *Buckman* explained: "[T]his court recognizes an independent cause of action in tort arising from an insurer's [common-law] duty of good faith. This cause of action is separate and distinct from the plaintiff's statutory claims. See *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 566, 479 A.2d 781 (1984); *Burgess* v. *Vanguard Ins. Co.*, 192 Conn. 124, 127, 470 A.2d 244 (1984); *Bibeault* v. *Hanover Ins. Co.*, 417 A.2d 313 (R.I. 1980). An 'implied covenant of good faith and fair dealing has been applied by this court in a variety of contractual relationships, including . . . insurance contracts; *Hoyt* v. *Factory Mutual Liberty Ins. Co.*, 120 Conn. 156, 159, 179 A. 842 (1935); *Bartlett* v. *Travelers Ins. Co.*, 117 Conn. 147, 155, 167 A. 180 (1933); cf. *Grand Sheet Metal Products Co.* v. *Protection Mutual Ins. Co.*, 34 Conn. [Supp.] 46, 375 A.2d 428 (1977) . . . .' *Magnan* v. *Anaconda Industries, Inc.*, supra [566]; see also 2 Restatement (Second), Contracts § 205 [p. 99 (1981)]; 43 Am. Jur. 2d [224–28], Insurance §§ 141, 142 [1982]; 3 [M. Rhodes, Couch on Insurance (2d Ed. 1984)] § 25.32 [pp. 327–31]." *Buckman* v. *People Express, Inc.*, supra, 170–71.

More recently, we have summarized the elements of such a claim, again in the insurance context: "[I]t is axiomatic that . . . every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed [on] by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term. . . .

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith.

Dorfman *v.* Smith

. . . Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive. . . . Bad faith means more than mere negligence; it involves a dishonest purpose.'' (Internal quotation marks omitted.) *Capstone Building Corp.* v. *American Motorists Ins. Co.*, 308 Conn. 760, 794–95, 67 A.3d 961 (2013). ''[V]iolations of express duties are necessary to maintain a bad faith cause of action.'' Id., 797.

In the present case, the majority concludes that, because the plaintiff's bad faith claim is based on alleged misconduct during the litigation, it is barred by the litigation privilege. See part II of the majority opinion. In part II B of this opinion, I explain why I disagree with the majority's conclusion that the plaintiff's bad faith claim is based exclusively on litigation conduct and why the prelitigation misconduct at issue is actionable in a bad faith claim under Connecticut law. In part II C, I explain why, to the extent that the claim is based on litigation conduct, the majority's analysis fails to adequately grapple with the relevant legal principles.

B

In the operative complaint, the plaintiff alleges that the defendant ''agreed to pay [her] all sums [that she] was legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle for damages resulting from bodily injury sustained by [her] in an accident involving the maintenance or use of the uninsured or underinsured motor vehicle, up to the limits of its contract.'' Although the operative complaint is not a model of clarity, it fairly can be read as also alleging that all of the conditions for the performance of the defendant's obligation to pay her for her bodily

Dorfman *v.* Smith

injuries were met at the time this action was initiated, the defendant knew at that time that it was obligated to pay the plaintiff, and it nevertheless refused to pay the claim but, instead, "compelled [the plaintiff] to resort to litigation to obtain what was due to her" under the insurance policy.[8] As I noted previously in this opin-

[8] The majority states that, "[a]s the master of her complaint, the plaintiff never argued to the trial court—and has not argued before this court—that she premised any of her claims on conduct that occurred outside the course of a judicial proceeding." Footnote 6 of the majority opinion. I agree that the plaintiff has not framed her argument in terms of prelitigation/postlitigation conduct. But this court is addressing an important legal issue, and we are not bound by the precise rubric and line drawing employed by the parties in arguing their respective positions. See, e.g., *Meribear Productions, Inc.* v. *Frank*, 340 Conn. 711, 732, 265 A.3d 870 (2021) ("it is well established that [w]e may . . . review legal arguments that differ from those raised by the parties if they are subsumed within or intertwined with arguments related to the legal claim before the court" (internal quotation marks omitted)). This is especially true when, as here, the scope of a court's subject matter jurisdiction is being adjudicated. Cf. *Fort Bend County* v. *Davis*, U.S. , 139 S. Ct. 1843, 1849, 204 L. Ed. 2d 116 (2019) ("Characterizing a rule as a limit on [subject matter] jurisdiction renders it unique in our adversarial system. . . . Unlike most arguments, challenges to [subject matter] jurisdiction may be raised by the defendant at any point in the litigation, and courts must consider them sua sponte." (Citation omitted; internal quotation marks omitted.)). Indeed, if, in light of the novelty and complexity of the issues presented, the briefing of both parties in this appeal leaves something to be desired and provides insufficient guidance for the proper adjudication of those issues, it is fair to say that the majority itself has not relied exclusively on arguments that are found in the defendant's brief. In my estimation, this is a good thing, because, otherwise, its opinion would fail to serve its public function.

To the extent that the majority is making a different point—by suggesting that, "[a]s the master of her complaint," the plaintiff has failed to *allege* prelitigation misconduct as a basis for her claim—I simply disagree, particularly when reading the complaint liberally, as we must. The plaintiff's complaint alleged, among other things, that, prior to the commencement of litigation, the defendant knew that the plaintiff (1) was not at fault in the underlying automobile accident, (2) had complied with all of her duties as a covered person under the insurance policy issued by the defendant, and (3) was legally entitled to recover underinsured motorist benefits from the defendant under the policy. The complaint then expressly alleged that, by engaging in the conduct alleged therein, the defendant violated its duty of good faith and fair dealing by "*compel*[*ing*] [*the plaintiff*] *to resort to litigation to obtain what was due to her from* [*the defendant*] *under the . . .*

342 Conn. 582 MARCH, 2022 631

Dorfman *v.* Smith

ion, CUIPA expressly identifies such conduct as an unfair claim settlement practice if it is part of a general business practice. See General Statutes § 38a-816 (6) (G) ("compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds" is unfair claim settlement practice). Although a single instance of such conduct does not give rise to a CUIPA violation in the absence of a general business practice, an insurer's refusal to honor a contractual obligation to pay a claim for no good reason does constitute bad faith conduct sufficient to state a claim for breach under our common law. See *Capstone Building Corp.* v. *American Motorists Ins. Co.*, supra, 308 Conn. 795 (refusal to perform express contractual obligation not prompted by honest mistake constitutes bad faith). I would therefore conclude that these allegations—which do not implicate the litigation privilege because they do not involve any litigation conduct by the defendant—are sufficient to withstand a motion to dismiss.

The majority, in my view, fails to acknowledge that the contractual obligations of liability insurance companies to their insureds are treated differently under Connecticut law than the obligations of most other contracting parties. Many parties may risk nothing more than contractual liability if they choose to meet a legitimate contractual demand with the time-honored response, "so sue me." An insurance company defending a first-party claim is different because it is subject to a higher duty under our common law and can incur liability if it compels its insured to resort to litigation to obtain payment due

*insurance policy* . . . ." (Emphasis added.) I take these allegations, liberally but fairly construed, to state a claim that the plaintiff was contractually entitled to obtain payment of her claim without resorting to litigation but was left no choice by the defendant's prelitigation conduct to commence litigation to obtain what was rightfully hers.

Dorfman *v.* Smith

under its insurance policy. See part II A of this opinion (discussing common law); cf. General Statutes § 38a-816 (6) (G). The litigation privilege does not bar such a claim.

C

To the extent that the plaintiff's bad faith claim is based in part on her allegations of litigation misconduct, it is far from clear to me that it is barred by the litigation privilege, and I am unpersuaded by the majority's application of the privilege under these circumstances. There is good reason to develop a more nuanced doctrine adapted to cases involving parties whose commercial activities involve frequent use of the courts as an intrinsic component of their business activities, and who are alleged to have breached a duty owed to the plaintiff in part by engaging in litigation misconduct. Our existing litigation privilege doctrine, properly applied to the present circumstances, readily accommodates this approach.

As the majority recognizes, when confronted with the question of whether the litigation privilege bars a claim, the inquiry is whether, viewed in its factual context, the plaintiff's claim—be it for fraud, tortious interference, or a statutory violation—is more like a claim for defamation or fraud, on the one hand, or a claim for vexatious litigation or abuse of process, on the other. See *MacDermid, Inc.* v. *Leonetti*, 310 Conn. 616, 631, 79 A.3d 60 (2013) (considering whether "the allegations in the counterclaim [for retaliation] are more akin to an abuse of process claim [than] a defamation or tortious interference claim" (internal quotation marks omitted)); *Simms* v. *Seaman*, 308 Conn. 523, 547–51, 69 A.3d 880 (2013) (analyzing whether fraud is similar to defamation for purposes of litigation privilege). Applying this analysis to the plaintiff's claims of bad faith, and even assuming that the claim relies necessarily on allegations of

Dorfman *v.* Smith

litigation misconduct, I would find that the complaint is not barred by the privilege.

The majority acknowledges that the litigation privilege does not bar abuse of process type claims but concludes that the plaintiff's bad faith claim is barred because it more closely resembles the type of claims to which the privilege applies, such as defamation and fraud. Specifically, the majority concludes that the bad faith claim is barred because, like defamation and fraud claims, (1) the claim was based exclusively on false statements made by the defendant in court filings; part II B of the majority opinion; (2) the plaintiff does not "challenge the purpose of any underlying litigation"; part II A of the majority opinion; and (3) other remedies exist for the complained of conduct. Part III C of the majority opinion. I disagree and would conclude that the bad faith claim fits comfortably within the framework of an abuse of process claim because it adequately alleges that the defendant acted with an improper purpose within the meaning of the common-law abuse of process doctrine.[9]

---

[9] Regarding the majority's conclusion that the plaintiff's bad faith claim is barred because it is based on false statements, I agree that the allegation relating to the defendant's filing of false discovery responses could be accurately characterized as an allegation of making false statements but offer two observations in response. First, as explained in part II B of this opinion, the bad faith count is not based *solely* on improper conduct in the litigation itself; it also expressly alleges a claim based on the defendant's prelitigation misconduct, namely, the conduct "compel[ing] [the plaintiff] to resort to litigation to obtain what was due to her from [the defendant] under the . . . insurance policy . . . ." The litigation misconduct is a continuation of the prelitigation misconduct. Second, to the extent that the allegations regarding false discovery responses are necessary to sustain the claim, that fact itself does not trigger the privilege. False statements in litigation will fall outside of the privilege if those statements are made in service of a misuse of the litigation process itself. Indeed, verbal statements in litigation are the means by which a party carries out the torts of vexatious litigation and abuse of process. The statements at issue in the present case are hardly gratuitous or peripheral in an underinsured motorist case; discovery responses identifying witnesses are mandatory, they are signed under oath, and they are meant to be relied on by the opposing party. See Practice Book

Dorfman *v.* Smith

A careful examination of the common-law tort of
abuse of process demonstrates why, contrary to the
majority's conclusion, the plaintiff's bad faith claim in
the present case—based not only on allegations that
the defendant improperly compelled the plaintiff to
resort to litigation to obtain payment, but that the defen-
dant then misused litigation procedures in an attempt
to avoid or delay the performance of its contractual
obligation to pay the plaintiff's valid claim—is far more
similar to an abuse of process claim, to which the litiga-
tion privilege does not apply, than to a claim of defama-
tion or fraud, to which the privilege does apply.

This court previously has held that, "[b]ecause the
tort [of abuse of process] arises out of the accomplish-
ment of a result that could not be achieved by the
proper and successful use of process, [§ 682 of the
Restatement (Second) of Torts] emphasizes that the
gravamen of the action . . . is the use of a legal process
. . . against another *primarily* to accomplish a pur-
pose for which it is not designed . . . . Comment [b]
to § 682 explains that the addition of primarily is meant
to exclude liability when the process is used for the
purpose for which it is intended, but there is an inciden-
tal motive of spite or an ulterior purpose of benefit to the
defendant." (Emphasis in original; internal quotation
marks omitted.) *Mozzochi* v. *Beck*, 204 Conn. 490, 494,
529 A.2d 171 (1987); see 3 Restatement (Second), Torts
§ 682, p. 474 (1977); 3 Restatement (Second), Torts,

Form 213 (plaintiff's interrogatories for uninsured/underinsured motorists
cases). If the defendant's pleadings and response to these interrogatories
were false, and if intended to weaken her resolve to pursue the litigation
and to compel her to abandon her claim or to accept substantially less than
the amount to which she is entitled, the false statements were part and
parcel of the defendant's abuse of process. In other words, unlike a fraud
claim, in which the essence of the claim is that the falseness of a communica-
tion *itself* injured the opposing party, the claim here is that the false litigation
communications were a tactic intended to prolong the litigation and to wear
down the plaintiff, in violation of the common-law and statutory duties the
defendant owed to the plaintiff.

Dorfman *v.* Smith

supra, § 682, comment (b), p. 475. Comment (a) to § 682
further provides that "it is immaterial that the process
was properly issued, *that it was obtained in the course
of proceedings that were brought with probable cause
and for a proper purpose*, or even that the proceedings
terminated in favor of the person instituting or initiating
them. The subsequent misuse of the process, though
properly obtained, constitutes the misconduct for which
the liability is imposed under the rule stated in this
[s]ection." (Emphasis added.) 3 Restatement (Second),
Torts, supra, § 682, comment (a), p. 474. Thus, *Mozzochi*
and § 682 of the Restatement (Second) of Torts clearly
indicate that the fact that the underlying proceedings
had a proper overall purpose does not immunize a party
from a claim for abuse of process when the claim alleges
that the defendant has used a particular judicial proce-
dure for an improper purpose, as, indeed, the majority
concedes. See part II A of the majority opinion ("the
plaintiff's cause of action must itself challenge the pur-
pose of the underlying litigation or litigation pro-
cedure").[10]

[10] In *Simms* v. *Seaman*, supra, 308 Conn. 523, we analyzed whether fraud
claims are sufficiently similar to abuse of process claims and vexatious
litigation claims to be exempt from the litigation privilege. We stated that,
to avoid the litigation privilege, "abuse of process claims must allege the
improper use of litigation to accomplish a purpose for which it was not
designed. . . . Likewise, vexatious litigation claims must allege, inter alia,
that the defendant acted primarily for a purpose other than that of bringing an
offender to justice and without probable cause." (Citation omitted; internal
quotation marks omitted.) Id., 546. The majority in *Simms* concluded that
fraud claims based on litigation conduct are barred by the privilege because,
unlike abuse of process claims, they "[do] not require consideration of
whether the underlying purpose of the litigation was improper but, rather,
whether an attorney's conduct while representing or advocating for a client
during a judicial proceeding that was brought for a proper purpose is entitled
to absolute immunity." Id., 546–47.

I have no quarrel with *Simms*, but it would be a serious mistake to view
that case as holding that any claim of litigation misconduct involving false
speech is always covered by the litigation privilege, so long as the "underlying
purpose of the litigation" itself is legitimate. That conclusion would, in one
stroke, largely eviscerate the tort of abuse of process as explicated in § 682
of the Restatement (Second) of Torts, *Mozzochi* v. *Beck*, supra, 204 Conn.

Dorfman *v.* Smith

The tort of abuse of process is not well defined.[11] See
*Italian Star Line, Inc.* v. *United States Shipping Board*

494, and other leading authorities. We know that *Simms* could not have
intended such a result, moreover, because our case law, including *Simms*
itself, acknowledges that such claims are outside the privilege.

[11] I note, for example, that there is little clarity regarding the scope and
meaning of the term "process." This court has recognized that "most courts
that have considered the issue have construed the term process broadly."
*Larobina* v. *McDonald*, 274 Conn. 394, 406, 876 A.2d 522 (2005); see, e.g.,
*Nienstedt* v. *Wetzel*, 133 Ariz. 348, 352, 651 P.2d 876 (1982) (process "has
been interpreted broadly, and encompasses the entire range of procedures
incident to the litigation process"); *Nienstedt* v. *Wetzel*, supra, 352–53 ("we
. . . consider as 'processes' of the court for abuse of process purposes, the
noticing of depositions, the entry of defaults, and the utilization of various
motions such as motions to compel production, for protective orders, for
change of judge, for sanctions and for continuances"); *Barquis* v. *Merchants
Collection Assn. of Oakland, Inc.*, 7 Cal. 3d 94, 104 n.4, 496 P.2d 817, 101
Cal. Rptr. 745 (1972) ("[p]rocess, as used in the tort of abuse of process,
has never been limited to the strict sense of the term, but instead has been
interpreted broadly to encompass the entire range of procedures incident
to litigation" (internal quotation marks omitted)); *Hough* v. *Stockbridge*, 152
Wn. App. 328, 346, 216 P.3d 1077 (2009) ("Depositions, motions, interroga-
tories, and other requests for discovery or legal maneuverings to compel or
prohibit action by an opponent all invoke the authority of the court. They
are, therefore, the type of process that will support an abuse of process
claim."), review denied, 168 Wn. 2d 1043, 234 P.3d 1173 (2010). As we stated
in *Larobina*, "[t]his broad reach of the abuse of process tort can be explained
historically, since the tort evolved as a [catchall] category to cover improper
uses of the judicial machinery that did not fit within the earlier established,
but narrowly circumscribed, action of malicious prosecution." (Internal
quotation marks omitted.) *Larobina* v. *McDonald*, supra, 406. A number of
courts have held, however, that not *all* litigation procedures constitute
"process." See *California Physicians' Service* v. *Superior Court*, 9 Cal.
App. 4th 1321, 1330, 12 Cal. Rptr. 2d 95 (1992) (Although an insurance
company's "ridiculously low" settlement offer could be introduced as evi-
dence of bad faith, "[d]efensive pleading, including the assertion of affirma-
tive defenses, is communication protected by the absolute litigation
privilege. Such pleading, even though allegedly false, interposed in bad faith,
or even asserted for inappropriate purposes, cannot be used as the basis
for allegations of ongoing bad faith. No complaint can be grounded [on]
such pleading."); *Ritter* v. *Ritter*, 381 Ill. 549, 555, 46 N.E.2d 41 (1943)
("Under [Illinois] jurisprudence the defendant may present any defense to
such an action that he may have or that he may deem expedient, and in so
doing he will not be subjecting himself to a second suit by the plaintiff
based on the wrongful conduct of the defendant in causing the plaintiff to
sue him or in defending the action. The rule is the same even though
the wrongful conduct of the defendant is [wilful], intentional, malicious or

Dorfman *v.* Smith

*Emergency Fleet Corp.*, 53 F.2d 359, 361 (2d Cir. 1931)
("the elements vital to an action for abuse of process
are not clearly defined, either by the cases or by writers
on the subject"); *Mozzochi* v. *Beck*, supra, 204 Conn.
496 ("[c]ourts have struggled to determine under what
circumstances . . . a complaint states a cause of
action for abuse of process"); *Board of Education of
Farmingdale Union Free School District* v. *Farming-
dale Classroom Teachers Assn., Inc., Local 1889, AFT
AFL-CIO*, 38 N.Y.2d 397, 400, 343 N.E.2d 278, 380
N.Y.S.2d 635 (1975) ("this tort is an obscure one . . .
one which is rarely brought to the attention of the courts
. . . and the vital elements of which are not clearly
defined" (citations omitted)). There appears to be gen-
eral agreement, however, that "[t]he improper purpose
usually takes the form of coercion to obtain a collateral
advantage, not properly involved in the proceeding
itself, such as the surrender of property or the payment
of money, by the use of the process as a threat or a

fraudulent."); W. Barker et al., "Litigating About Litigation: Can Insurers Be
Liable for Too Vigorously Defending Their Insureds?," 42 Tort Trial & Ins.
Prac. L.J. 827, 854 (2007) ("[t]he cases almost uniformly reject plaintiffs'
attempts to impose liability based on allegedly frivolous defenses, suppos-
edly asserted only to delay an inevitable recovery"); cf. *Dean* v. *Kirkland*,
301 Ill. App. 495, 509–10, 23 N.E.2d 180 (1939) (filing of false pleadings,
falseness of which would be determined during course of underlying pro-
ceeding, was not abuse of process). But see *Aranson* v. *Schroeder*, 140 N.H.
359, 366–67, 671 A.2d 1023 (1995) (adopting tort of malicious defense if
defendant raises defense without probable cause for purpose of harassing
opponent or delaying litigation, and proceeding is terminated in favor of
plaintiff). Other authorities have limited the tort to process of a type that
compels "the performance or forbearance of some prescribed act." (Internal
quotation marks omitted.) *Long* v. *Long*, 136 N.H. 25, 31, 611 A.2d 620 (1992);
see *Board of Education of Farmingdale Union Free School District* v.
*Farmingdale Classroom Teachers Assn., Inc., Local 1889, AFT AFL-CIO*,
38 N.Y.2d 397, 400–404, 343 N.E.2d 278, 380 N.Y.S.2d 635 (1975); see also 1
Am. Jur. 2d 492, Abuse of Process § 2 (2016) (" 'process,' the abuse of
which may support an abuse of process claim, is not limited to the original
pleadings; depositions, motions, interrogatories and other requests for dis-
covery, or legal maneuverings *to compel or prohibit action by an opponent*
all invoke the authority of the court and are, therefore, the type of process
that will support an abuse of process claim" (emphasis added)).

Dorfman *v.* Smith

club.'' W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 121, p. 898; accord *Preferred Properties, Inc.* v. *Indian River Estates, Inc.* 276 F.3d 790, 801–802 (6th Cir.), cert. denied, 536 U.S. 959, 122 S. Ct. 2663, 153 L. Ed. 2d 838 (2002); see also *Board of Education of Farmingdale Union Free School District* v. *Farmingdale Classroom Teachers Assn., Inc., Local 1889, AFT AFL-CIO*, supra, 404 (''[L]egal procedure must be utilized in a manner consonant with the purpose for which that procedure was designed. [When] process is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail or retribution, the tort of abuse of process will be available to the injured party.''). A number of courts have held that this definition is capacious enough to include an attempt by an insurance company to use legal procedures to bully the opposing party into abandoning litigation or settling it favorably. See *General Refractories Co.* v. *Fireman's Fund Ins. Co.*, 337 F.3d 297, 308 (3d Cir. 2003) (if severe enough, using litigation process to harass, drain resources, delay payment and delay litigation can constitute abuse of process); *Crackel* v. *Allstate Ins. Co.*, 208 Ariz. 252, 260, 92 P.3d 882 (App. 2004) (''[The plaintiffs] maintain that [the defendant insurer] used the prospect of sustained and expensive litigation as a 'club' in an attempt to coerce them, and other similarly situated claimants, to surrender those causes of action that sought only modest damages. We have little trouble concluding that such a use of court processes would be improper.''); *Givens* v. *Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 401 (Tenn. 2002) (''a primary desire to harass and cause unnecessary expense to the other party in litigation is a sufficient ulterior motive to constitute an abuse of process''); *Givens* v. *Mullikin ex rel. Estate of McElwaney*, supra, 401–402 (insurer's intent to weaken claimant's resolve to pursue litigation is improper purpose); see also *Bull*

Dorfman *v.* Smith

v. *McCuskey*, 96 Nev. 706, 709, 615 P.2d 957 (1980) (filing lawsuit to coerce nuisance settlement constitutes abuse of process); cf. *McGann* v. *Allen*, 105 Conn. 177, 186–87, 134 A. 810 (1926) (filing criminal complaint for purpose of compelling plaintiff to settle claim for allegedly stolen goods tends to show malice for purpose of malicious prosecution claim).[12]

The foregoing review demonstrates, at the very least, that the present case involves complexities and nuances

---

[12] But see *Bird* v. *Rothman*, 128 Ariz. 599, 602, 627 P.2d 1097 (App. 1981) ("[t]here was no proof of an improper use of judicial process . . . as the purpose of settlement is includable in the goals of proper process"), review denied, Arizona Supreme Court (May 5, 1981), cert. denied, 454 U.S. 865, 102 S. Ct. 327, 70 L. Ed. 2d 166 (1981); *Azer* v. *Myers*, 8 Haw. App. 86, 129–30 and n.38, 793 P.2d 1189 (trial court properly instructed jury that "[t]he commencement of a lawsuit for the purpose of obtaining a settlement (which may include the payment of money or insurance proceeds) is included in the goals of proper process and, therefore, does not by itself give rise to liability for abuse of process"), rev'd in part on other grounds, 71 Haw. 506, 795 P.2d 853 (1990); *Myers* v. *Cohen*, 5 Haw. App. 232, 244, 687 P.2d 6 ("[e]ven if frivolous, the counterclaim had the purpose of settlement which is includable in the goals of proper process" (internal quotation marks omitted)), rev'd on other grounds, 67 Haw. 389, 688 P.2d 1145 (1984); *Ritter* v. *Ritter*, 381 Ill. 549, 555, 46 N.E.2d 41 (1943) ("Under [Illinois] jurisprudence the defendant may present any defense to such an action that he may have or that he may deem expedient, and in so doing he will not be subjecting himself to a second suit by the plaintiff based on the wrongful conduct of the defendant in causing the plaintiff to sue him or in defending the action. The rule is the same even though the wrongful conduct of the defendant is [wilful], intentional, malicious or fraudulent."); W. Barker et al., "Litigating About Litigation: Can Insurers Be Liable for Too Vigorously Defending Their Insureds?," 42 Tort Trial & Ins. Prac. L.J. 827, 854 (2007) ("[t]he cases almost uniformly reject plaintiffs' attempts to impose liability based on allegedly frivolous defenses, supposedly asserted only to delay an inevitable recovery"). At least one such case arises in the first-party insurance context. See *California Physicians' Service* v. *Superior Court*, 9 Cal. App. 4th 1321, 1330, 12 Cal. Rptr. 2d 95 (1992) (Although an insurance company's "ridiculously low" settlement offer could be introduced as evidence of bad faith, "[d]efensive pleading, including the assertion of affirmative defenses, is communication protected by the absolute litigation privilege. Such pleading, even though allegedly false, interposed in bad faith, or even asserted for inappropriate purposes, cannot be used as the basis for allegations of ongoing bad faith. No complaint can be grounded [on] such pleading.")

Dorfman *v.* Smith

that the majority does not fully examine.[13] There is
ample support for the proposition that, when specific
procedures—including "the noticing of depositions, the
entry of defaults, and the utilization of various motions
such as motions to compel production, for protective
orders, for change of judge, for sanctions and for contin-
uances"—are undertaken for an improper ulterior pur-
pose, they are not subject to the litigation privilege,
regardless of whether the underlying litigation was
proper. *Nienstedt* v. *Wetzel*, 133 Ariz. 348, 352–53, 651
P.2d 876 (1982); see *Hough* v. *Stockbridge*, 152 Wn. App.
328, 346, 216 P.3d 1077 (2009) ("Depositions, motions,
interrogatories, and other requests for discovery or
legal maneuverings to compel or prohibit action by an
opponent all invoke the authority of the court. They
are, therefore, the type of process that will support an
abuse of process claim."), review denied, 168 Wn. 2d
1043, 234 P.3d 1173 (2010). There also is ample support
for the proposition that, for purposes of the tort of
abuse of process, an improper ulterior purpose may
include an intent by an insurance company to harass,
to drain resources, to delay payment, to coerce the
opposing party into abandoning the litigation or settling.
See *General Refractories Co.* v. *Fireman's Fund Ins.
Co.*, supra, 337 F.3d 308; *Crackel* v. *Allstate Ins. Co.*,
supra, 208 Ariz. 258–59; *Givens* v. *Mullikin ex rel. Estate
of McElwaney*, supra, 75 S.W.3d 401–402.

Similarly, if an insurance company misuses a litiga-
tion procedure with the intent of avoiding or delaying
the performance of its contractual obligations to an
insured, I see no reason why the litigation privilege
should bar a bad faith claim based on that conduct.
Such a claim is far more akin to an abuse of process
claim than to a defamation claim, and multiple courts

[13] I do not fault the majority in this regard. As I have indicated, the plaintiff's
allegations of bad faith are relatively weak, and neither party has adequately
briefed the underlying legal complexities involved. To modify the adage,
bad facts and inadequate briefing make bad law.

Dorfman *v.* Smith

have recognized that an insurance company's obligation to investigate and settle claims in good faith does not end when litigation begins. See, e.g., *Tucson Airport Authority* v. *Certain Underwriters at Lloyd's, London*, 186 Ariz. 45, 48, 918 P.2d 1063 (App. 1996) ("[t]he duties [of good faith and fair dealing] would be rendered meaningless if . . . the litigation privilege could be employed to excuse a breach of those duties, which occurs as part of the conduct of a coverage action"), review denied, Arizona Supreme Court, Docket No. 2 CA-CV 95-0052 (June 19, 1996); *Gooch* v. *State Farm Mutual Automobile Ins. Co.*, 712 N.E.2d 38, 43 (Ind. App. 1999) (insurance company's intentional refusal to investigate matter relevant to claim in order to provide counsel with "a 'litigation position' " could support bad faith claim), transfer denied, 735 N.E.2d 223 (Ind. 2000); *Federated Mutual Ins. Co.* v. *Anderson*, 297 Mont. 33, 43, 991 P.2d 915 (1999) (jury could consider insurance company's frivolous appeal as evidence of bad faith conduct);[14] *O'Donnell ex rel. Mitro* v. *Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. 1999) ("bad faith suits are not restricted to the denial of claims, but, rather, may extend to the misconduct of an insurer during the pendency of litigation" (internal quotation marks omitted)); *Poling* v. *Motorists Mutual Ins. Co.*, 192 W. Va. 46, 48, 450 S.E.2d 635 (1994) (plaintiff is not precluded from bringing bad faith action based on insurance company's litigation conduct).

The majority states that the litigation privilege applies in this case because the plaintiff's bad faith claim "does not require the plaintiff to challenge either the purpose of the underlying litigation or the purpose of a particular judicial procedure." Part II A of the majority opinion. This assertion is flatly incorrect. To prevail on her claim

---

[14] Thus, even if litigation misconduct in furtherance of an unfair claim settlement practice cannot provide the basis for a bad faith violation, it should be admissible as evidence of one.

that the defendant engaged in bad faith litigation conduct, the plaintiff would be required to establish that the defendant used litigation procedures, such as filing baseless special defenses or false discovery responses, for the improper purposes alleged in her complaint, namely, "forc[ing] [the plaintiff] to undergo an unnecessarily time consuming and expensive course of litigation to obtain what was legally due to [her]" and "frustrat[ing] [her] ability to receive benefits due [to her] under her contract."

The majority also argues that, "[i]f [this concurring and dissenting opinion] were correct that the plaintiff's factual allegations were sufficient . . . to challenge the defendant's use of the courts, any plaintiff could pierce the litigation privilege with any cause of action by merely including allegations that a defendant's conduct constituted an abuse of the judicial system." Part II A of the majority opinion. Not at all. First, I have repeatedly stressed in this opinion that my conclusions are driven largely by the special considerations that arise from the relationship between an insurance company and a first-party insured, considerations that are embedded in the common-law bad faith doctrine, including the asymmetry between the insured and the insurer with respect to bargaining power and litigation experience and the special vulnerabilities of an insured who has suffered a covered loss. See part II A of this opinion; see also part III B of this opinion (discussing similar considerations in connection with CUIPA and CUTPA). Second, some "improper purposes," such as the intent to defraud or defame, have been found not to constitute abuse of process as a matter of law for purposes of the litigation privilege; an allegation that the defendant's fraud or defamation constituted abuse of process could not survive a motion to dismiss. But, if a party can allege facts showing that a defendant has abused judicial procedures for a purpose that *has* been recognized

Dorfman *v.* Smith

as improper, such as to stonewall an insured who is entitled to payment of a valid claim under the applicable policy without resorting to litigation, I see no reason why the litigation privilege should bar that claim at this preliminary stage of the proceedings. Of course, the plaintiff then bears the burden of *proving* these allegations at trial.

I also disagree with majority's suggestion that a properly alleged bad faith claim based on an insurance company's litigation conduct would be subject to the litigation privilege because of the availability of alternative remedies, including a claim pursuant to General Statutes §§ 52-99[15] or General Statutes § 52-568.[16] See part II C of the majority opinion. In my view, that consideration should carry little weight if public policy otherwise counsels in favor of recognizing such claims, particularly when, as here, the supposed "remedy" may provide no meaningful relief at all to the individual plaintiff. Unlike a lawsuit alleging bad faith, the alternative remedies identified by the majority, such as court imposed sanctions, attorney grievance proceedings and contempt proceedings, are not intended to compensate the victims who actually have been injured by bad faith litigation conduct. Indeed, such alternative remedies are also available when a party has engaged in abuse of process, yet that tort is not subject to the privilege.

[15] General Statutes § 52-99 provides: "Any allegation or denial made without reasonable cause and found untrue shall subject the party pleading the same to the payment of such reasonable expenses, to be taxed by the court, as may have been necessarily incurred by the other party by reason of such untrue pleading; provided no expenses for counsel fees shall be taxed exceeding ten dollars for any one offense."

[16] General Statutes § 52-568 provides: "Any person who commences and prosecutes any civil action or complaint against another, in his own name or the name of others, or asserts a defense to any civil action or complaint commenced and prosecuted by another (1) without probable cause, shall pay such other person double damages, or (2) without probable cause, and with a malicious intent unjustly to vex and trouble such other person, shall pay him treble damages."

Dorfman *v.* Smith

I would further note that, because §§ 52-99 and 52-568 make it clear that it is the strong public policy of this state to discourage dishonesty during the litigation process, those statutes *support* the plaintiff's argument that the privilege does not bar a claim that an insurance company violated its obligation of good faith by engaging in such conduct.

To summarize, I do not agree with the majority's conclusion that the plaintiff's bad faith claim is premised exclusively on false statements in the course of the litigation and, instead, would conclude that the plaintiff has adequately alleged a bad faith claim based on conduct entirely outside of the litigation. Even if I agreed with the conclusion that the plaintiff's bad faith claim is barred because it is premised exclusively on false statements in the course of the litigation, I would not agree with the remainder of the majority's analysis. I therefore dissent from part II of the majority opinion. Because the defendant makes no claim that an insurance company's bad faith conduct outside the context of litigation cannot provide the basis for a claim of negligent infliction of emotional distress, I would also conclude that the allegations in count four of the plaintiff's complaint are sufficient to withstand a motion to dismiss. If the plaintiff could demonstrate at trial that the defendant acted in bad faith within the meaning of Connecticut law, I believe that she would be entitled to recover damages for negligent infliction of emotional distress on that basis. Accordingly, I also dissent from part III of the majority opinion.

III

I next address part IV of the majority opinion addressing the plaintiff's CUIPA/CUTPA claim. To put the matter directly, I am concerned that the majority's discussion of the litigation privilege in this case will be extended to CUIPA/CUTPA cases involving allegations

342 Conn. 582 MARCH, 2022 645

Dorfman *v.* Smith

that an unscrupulous insurance company is engaging
in unfair claim settlement practices, in whole or in part,
by purposely utilizing the litigation process, or particu-
lar litigation tactics, as an integral part of a general
business with that objective. I genuinely appreciate the
majority's effort to acknowledge the limited scope of
its holding,[17] and, in light of that caveat, I may be over-
reacting to the possibility that its holding will be
extended to the situation I describe. A cautionary note
seems prudent nonetheless. In part III A, I express my
disappointment that the majority reaches the question
at all of whether the litigation privilege applies to the
CUIPA/CUTPA claim, as alleged in count five of the
plaintiff's complaint; in my estimation, that claim is
legally insufficient wholly apart from any issue of privi-
lege. Part III B of this opinion takes issue with certain
language used by the majority that I consider unneces-
sary to the opinion and better left to a case in which
the issues addressed are properly before the court.

A

In my view, there is no need to address the litigation
privilege at all in connection with the CUIPA/CUTPA
claim, as alleged by the plaintiff in the present case.
The majority correctly observes that the only part of
the plaintiff's complaint coming anywhere close to
asserting a CUIPA violation are her allegations that
(1) the defendant responded falsely to the plaintiff's
discovery requests, and (2) this conduct represents a
general business practice because the defendant admit-

---

[17] I refer in particular to the following passage in the majority opinion: "This
[holding] does not mean . . . that a defendant enjoys absolute immunity
for all CUTPA claims under the litigation privilege, even those premised on
a violation of CUIPA. Rather, we merely hold that this specific claim—a
business practice of filing false discovery responses—is afforded absolute
immunity. . . . Our holding leaves open the possibility that other CUTPA
claims may not be barred by absolute immunity under the litigation privi-
lege." Part IV of the majority opinion.

Dorfman *v.* Smith

ted that it did not single the plaintiff out for special treatment when it provided the false responses. See part IV of the majority opinion. I would have preferred that the majority explain that these factual assertions fail adequately to allege that the purported misconduct occurred with such frequency as to indicate a general business practice, and stop there. Instead, the majority chooses to "assume" that a general business practice is alleged, and then explains why the act of filing false discovery responses is within the scope of the litigation privilege in a CUIPA/CUTPA case. See id.

I am aware of no good reason to assume that a legally insufficient pleading is legally sufficient under these circumstances, and I consider it unwise to do so. The discussion of the litigation privilege in the majority opinion is unnecessary because the critical allegation required to state a CUIPA claim—that filing false discovery responses is part of the defendant's "general business practice"—is deficient as a matter of law. As the majority points out, the sole, relevant allegation consists of the plaintiff's assertion that "the defendant 'did not single [her] out . . . for special or unique treatment when it responded falsely to [her] discovery requests.' " Id. Even if this allegation is construed liberally, as it must be, the complaint fails to allege that the conduct at issue was committed "with such frequency as to indicate a general business practice," as CUIPA requires. General Statutes § 38a-816 (6). The allegation that the plaintiff was not singled out for special or unique treatment does not state, or even imply, that the defendant files false discovery answers frequently, as part of a general business practice, plan or strategy. It means only that the discovery misconduct of which the plaintiff complains was not undertaken against her with any personal animus or particularized intent. The plaintiff is "the master of her complaint," as the majority points out; footnote 6 of the majority opinion; and was permit-

Dorfman *v.* Smith

ted in this case to amend that pleading numerous times before its sufficiency was tested by motion. If the plaintiff wanted to allege that the defendant frequently engages in the same misconduct with other insureds, it is not too much to require an explicit allegation to that effect.

Normally, it would not be a cause for concern that we proceed to take up a merits issue by assuming that the plaintiff's complaint states an otherwise cognizable claim. But the situation is different here for three related reasons. First, the merits issue, even in its most basic formulation—namely, the applicability of the litigation privilege to CUTPA claims—presents an important issue of first impression in this court. Second, while that issue of first impression is difficult enough in its simplest form, it becomes far more complicated in the context of a case like this one, which involves a first-party CUIPA/ CUTPA claim against an insurance company. The difficulty arises because the defendants in these cases are engaged in the *business* of litigation and are therefore able, if they choose, to misuse litigation systemically in a way that distinguishes CUIPA/CUTPA claims from the type of garden-variety tort claims in which the litigation privilege traditionally applies, and that distinguishes insurance company defendants from the class of litigants traditionally subject to the privilege. Third, this particular case is very poorly suited as a means to properly address the important and difficult merits issues, not only because the factual allegations are so thin and weak, but also because neither party has provided us with adequate briefing on the CUIPA/CUTPA issue.

These three reasons help explain why I would have avoided the merits altogether with respect to the plaintiff's CUIPA/CUTPA claim. Although the majority opinion is intended to apply only to the facts as alleged, in my view, it would be better to say nothing at all, because,

Dorfman *v.* Smith

especially in the absence of adequate briefing, the court cannot be expected to grapple with, much less resolve, the far more complex and nuanced issues that would be implicated in CUIPA/CUTPA cases involving genuinely serious claims of unfair claim settlement practices effectuated, in whole or part, through a business practice involving litigation misconduct.

B

The majority states that "the litigation privilege bars CUTPA claims, like the claim at issue, premised solely on general allegations of intentionally false discovery responses . . . ." Part IV of the majority opinion. In addition, the majority concludes that the claim is barred because other remedies are available. Id. This narrow holding appears to leave open the possibility that a CUIPA/CUTPA claim that is not based *solely* on the falsity of communications made during the course of litigation would not be barred.[18] I take this as positive

---

[18] All of the cases cited by the majority in support of its conclusion that the litigation privilege bars CUTPA claims involved claims by the plaintiff that the defendant had provided false information during a judicial proceeding. See *Graham* v. *U.S. Bank, National Assn.*, Docket No. 3:15-cv-0990-AC, 2015 WL 10322087, *15 (D. Or. December 2, 2015) (privilege protects communications made during judicial proceeding), report and recommendation adopted, 2016 WL 393336 (D. Or. February 1, 2016); *Trent* v. *Mortgage Electronic Registration Systems, Inc.*, 618 F. Supp. 2d 1356, 1360 (M.D. Fla. 2007) (privilege applies to communications in judicial proceedings), aff'd, 288 Fed. Appx. 571 (11th Cir. 2008); *PSN Illinois, Inc.* v. *Ivoclar Vivadent, Inc.*, Docket No. 04 C 7232, 2005 WL 2347209, *6 (N.D. Ill. September 21, 2005) (litigation privilege precludes deceptive trade practices claim based on statements made in course of litigation); *Bruno* v. *Travelers Cos.*, 172 Conn. App. 717, 725, 161 A.3d 630 (2017) (privilege confers immunity on "those who provide information in connection with judicial and quasi-judicial proceedings" (internal quotation marks omitted)); *Tyler* v. *Tatoian*, 164 Conn. App. 82, 94, 137 A.3d 801 (statements made in course of judicial proceedings are privileged), cert. denied, 321 Conn. 908, 135 A.3d 710 (2016). For the reasons stated in the body of this opinion, I believe that a strong argument can be made that the policy considerations underlying this rule carry much less weight when the defendant has made it a *business practice* to provide false information in judicial proceedings. Even if the majority is correct, however, that false statements in the course of litigation are always subject to the privilege, that would not mean that CUIPA/CUTPA claims

Dorfman *v.* Smith

news. The issues under consideration are complex, and there is strong authority for the proposition that, in a case involving more robust factual allegations, conduct that is designed to harass or delay an insured can constitute abuse of process.[19] See part II C of this opinion (addressing authorities at length.) In addition, multiple courts have held that litigation conduct by an insurance company that is designed to coerce the withdrawal of a claim or a settlement unfavorable to the plaintiff may give rise to a claim of bad faith.[20] I see no reason why a CUTPA claim based on the systematic use of litigation for these purposes should be barred merely because the underlying litigation pursued by the insured was properly brought. Indeed, this point seems especially strong because the legislature has expressly recognized that an insurance company can engage in an unfair claim settlement practice by forcing an insured into litigation in order to obtain his or her contractual benefits. See General Statutes § 38a-816 (6) (G) (listing as prohibited unfair claim settlement practice "compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds"). This statutory provision means that an insurance company, unlike other litigants, can abuse the litigation system merely by compelling an insured to resort to that system as a means of "dispute" resolution.

based on other litigation misconduct designed to harass the plaintiff or delay the proceedings would be barred. See part II of this opinion.

[19] See, e.g., *General Refractories Co.* v. *Fireman's Fund Ins. Co.*, supra, 337 F.3d 308; *Crackel* v. *Allstate Ins. Co.*, supra, 208 Ariz. 258–59; *Givens* v. *Mullikin ex rel. Estate of McElwaney*, supra, 75 S.W.3d 401–402.

[20] See *Tucson Airport Authority* v. *Certain Underwriters at Lloyd's, London*, supra, 186 Ariz. 48; *Gooch* v. *State Farm Mutual Automobile Ins. Co.*, supra, 712 N.E.2d 43; *Federated Mutual Ins. Co.* v. *Anderson*, supra, 297 Mont. 43–44; *O'Donnell ex rel. Mitro* v. *Allstate Ins. Co.*, supra, 734 A.2d 906; *Poling* v. *Motorists Mutual Ins. Co.*, supra, 192 W. Va. 48.

My point is not that there is a perfect identity between an abuse of process claim and a well pleaded CUIPA/ CUTPA claim alleging that the defendant has engaged in unfair claim settlement practices effectuated, in whole or part, through a business practice involving litigation misconduct. A perfect fit is not required to make the litigation privilege inapplicable, or, otherwise, the majority's analysis could be stated in one sentence: a CUIPA/ CUTPA claim is barred because every claim is barred that does not state a cause of action for vexatious litigation or abuse of process. As the majority recognizes, the proper inquiry, rather, is whether, when viewed in its factual context, the plaintiff's claim—whether it be for fraud, tortious interference, or a statutory violation—is more like a claim for defamation or fraud, on the one hand, or a claim for vexatious litigation or abuse of process, on the other. See *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 631 (considering whether "the allegations in the counterclaim [for retaliation] are more akin to an abuse of process claim [than] a defamation or tortious interference claim" (internal quotation marks omitted)); *Simms* v. *Seaman*, supra, 308 Conn. 547–51 (analyzing whether fraud is similar to defamation for purposes of litigation privilege). We cannot resolve the inquiry in the abstract with respect to some future CUIPA/CUTPA claim, and I do not intend to suggest a definitive answer here. I am convinced only that it is a real issue and has not yet been properly presented or briefed before this court.

With respect to the issue of alternative remedies, the legislature enacted CUTPA with the intent "of encouraging litigants to act as private attorneys general" to combat *systemic* unfair business practices. *Stone* v. *East Coast Swappers, LLC*, 337 Conn. 589, 605, 255 A.3d 851 (2020). It undermines this intent to limit a plaintiff's remedies to sanctions, grievance proceedings and contempt proceedings restricted to particular acts of miscon-

Dorfman *v.* Smith

duct in a single case, when the allegations claim a *systemic* business practice across multiple cases.

Despite leaving open the possibility that CUIPA/ CUTPA claims based on other types of litigation misconduct might not be subject to the litigation privilege, the majority suggests that, if the legislature had wanted claims based on systematic litigation misconduct to be subject to CUTPA, it "would have been explicit in abrogating the immunity . . . ." Part IV of the majority opinion. I disagree with this speculation. This court has recognized that "[t]he Connecticut General Assembly deliberately chose not to define the scope of unfair or deceptive acts proscribed by CUTPA so that courts might develop a body of law responsive to the marketplace practices that actually generate such complaints." *Sportsmen's Boating Corp.* v. *Hensley*, 192 Conn. 747, 755, 474 A.2d 780 (1984). "Because CUTPA is a self-avowed remedial measure . . . it is construed liberally in an effort to effectuate its public policy goals." (Citation omitted; internal quotation marks omitted.) Id., 756. In light of the legislature's deliberate choice to allow the courts to define the scope of proscribed conduct and the statute's broad remedial purpose, it seems extremely doubtful to me that the legislature's failure to expressly recognize an exception to the common-law litigation privilege for CUTPA claims involving conduct during litigation evinces an intent to bar such claims. Cf. *Barefield* v. *DPIC Cos.*, 215 W. Va. 544, 554, 600 S.E.2d 256 (2004) ("We find no caveat in the [West Virginia Unfair Trade Practices Act] . . . [that] states that an insurance company or other person in the business of insurance . . . has a duty to refrain from unfair methods of competition or unfair or deceptive acts or practices [only] prior to the filing of a lawsuit by a party, but has no such duty thereafter. We find nothing to show that the public policy established in [the statute] is obviated once litigation ensues. We therefore must conclude that the language of the [statute] does not

Dorfman *v.* Smith

restrict the scope of the conduct that is proscribed . . . to that which occurred prior to the filing of a lawsuit.'' (Internal quotation marks omitted.)).[21] This is especially so because, as discussed, the legislature expressly included litigation related misconduct as one means by which an insurance company could engage in unfair claim settlement practices. See General Statutes § 38a-816 (6) (G). It would be incongruous for the legislature to have declared such conduct unlawful if it believed that the

[21] The court in *Barefield* also concluded that, although "the conduct of an insurance company or other person in the business of insurance during the pendency of a lawsuit may support a cause of action under the West Virginia Unfair Trade Practices Act," "an insurance company cannot be held liable . . . for the actions of a defense attorney retained to defend an insured, when the defense attorney's strategy and tactics are a result of the attorney's independent, professional discretion with regard to the representation of the client-insured, and are not otherwise relied [on] or ratified by the insurance company in a manner contrary to the [a]ct." *Barefield* v. *DPIC Cos.*, supra, 215 W. Va. 559.

The majority cites to *Harrison* v. *Nationwide Mutual Fire Ins. Co.*, 580 F. Supp. 133, 136 (E.D. Pa. 1983), for the proposition that "an unfair insurance practices claim [that] is premised on pleadings or documents filed in and relevant to an underlying judicial proceeding . . . is absolutely privileged, even if the statements were made falsely or maliciously." Part IV of the majority opinion. The majority misreads *Harrison*. The claim in that case was not that the defendant insurance company had violated Pennsylvania's Unfair Insurance Practices Act by systematically abusing the judicial process for the purpose of coercing the abandonment of claims or favorable settlements. Rather, the plaintiffs claimed that the insurance company had *defamed* them by claiming that the house fire for which the plaintiffs sought coverage was caused by arson and that they had misrepresented their damages. Id., 134. The court held that a defamatory statement contained in an answer to a complaint is "*absolutely privileged* and . . . even if made falsely or maliciously and without reasonable and probable cause, *is an absolute bar* to an action of libel based on such averments." (Emphasis in original; internal quotation marks omitted.) Id., 136. This is hardly surprising, as defamation is the paradigmatic tort to which the privilege applies. Although the plaintiffs in *Harrison* did raise a claim under Pennsylvania's Unfair Insurance Practices Act; see id., 137; the basis for the claim was not stated, and there is no indication that the insurance company raised a litigation privilege defense to the claim. Rather, the court concluded that the claim was barred because "[t]he relief sought by [the] plaintiffs [namely, damages in excess of $20,000] is not what [the Unfair Insurance Practices] Act provides as a penalty for its violation." Id., citing *Nazer* v. *Safeguard Mutual Assurance Co.*, 293 Pa. Super. 385, 439 A.2d 165 (1981); see *Nazer* v. *Safeguard Mutual Assurance Co.*, supra, 387 (Pennsylvania act does not create private cause of action).

342 Conn. 582 MARCH, 2022 653

Dorfman *v.* Smith

policies underlying the litigation privilege should apply to insurance companies defending first-party claims. In any event, the parties have not given us a word of briefing on the issue, and the facts of the case provide us with an extremely poor framework within which to decide the issue. Indeed, the majority appears to agree that, in the appropriate, future case, we could decide, like the court in *Barefield*, that the balancing of public policy interests clearly weighs in favor of allowing properly pleaded CUTPA claims based on systemic abusive litigation tactics by insurance companies in furtherance of an unfair claim settlement practice. As I explained in part II of this opinion, it is well established that insurance contracts impose, at the very least, a duty of good faith and fair dealing running from an insurer to its insured, and several courts have held that that obligation continues during and within the litigation process. When the proper case arises, we should seriously consider the possibility that systemic imbalances between insurers and insureds make it tempting and profitable for insurance companies to violate this obligation of good faith as a general business practice. See J. Ellison & T. Law, "Bad Faith and Punitive Damages: The Policyholder's Guide to Bad Faith Insurance Coverage Litigation—Understanding the Available Recovery Tools," American Law Institute—American Bar Association Continuing Legal Education, Westlaw No. SK095 ALI-ABA *251, *259–72 (June 16, 2005) (discussing systemic imbalances between insureds and insurers). As one court has observed, "[i]nsurance is different. Once an insured files a claim, the insurer has a strong incentive to conserve its financial resources balanced against the effect on its reputation of a hard-ball approach. Insurance contracts are also unique in another respect. Unlike other contracts, the insured has no ability to cover if the insurer refuses without justification to pay a claim. Insurance contracts are like many other contracts in that one party (the insured) renders perfor-

Dorfman *v.* Smith

mance first (by paying premiums) and then awaits the counter-performance in the event of a claim. Insurance is different, however, if the insurer breaches by refusing to render the counter-performance. In a typical contract, the [nonbreaching] party can replace the performance of the breaching party by paying the [then prevailing] market price for the counter-performance. With insurance this is simply not possible. This feature of insurance contracts distinguishes them from other contracts and justifies the availability of punitive damages for breach in limited circumstances.'' (Footnotes omitted; internal quotation marks omitted.) *E.I. DuPont de Nemours & Co.* v. *Pressman*, 679 A.2d 436, 447 (Del. 1996).

As I indicated, insurance is also different because insurance companies are effectively in the business of litigation.[22] "[I]nsurance companies are bulk purchasers

[22] The majority points out that "this court consistently has applied the litigation privilege to attorneys, who, without a doubt, are in the business of litigation." Footnote 18 of the majority opinion. The comparison between litigation attorneys and insurance companies is inapt. First, litigation attorneys, unlike liability insurance companies sued in first-party actions, do not owe any duty of care (except as imposed by ethical rules) to the opposing party, whereas liability insurance companies owe a heightened duty of care to their insureds. Compare *State* v. *Acordia, Inc.*, 310 Conn. 1, 37, 73 A.3d 711 (2013) (stating, albeit in dictum, that "an insurer generally has a fiduciary relationship with its insured"), with *Mozzochi* v. *Beck*, supra, 204 Conn. 497 (stating that liability rules must not "interfere with the attorney's primary duty of robust representation of the interests of his or her client"). Second, attorneys, unlike insurance companies, are categorically excluded from CUTPA in connection with their litigation activities, privileged or not. See *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 34, 699 A.2d 964 (1997) (CUTPA applies to attorneys only with respect to "the entrepreneurial or commercial aspects of the profession"). Third, the crux of the problem that I address in this opinion is precisely that liability insurance companies, *as parties*, are in the business of litigation *in furtherance of their business interests outside of litigation*, i.e., as insurance companies. Their unusual hybrid character enables them, if so inclined, to *systematically* misuse their litigation activities *for the purpose of furthering that nonlitigation business activity*. Litigation attorneys who engage in wrongful litigation conduct, by contrast, have both feet firmly planted in the business of litigation; any systemic abuse they may perpetrate occurs wholly within the judicial system

342 Conn. 582 MARCH, 2022 655

Dorfman *v.* Smith

of legal services; they incur proportionately lower litigation costs than their policyholders, and can reuse work product from case to case.'' J. Ellison & T. Law, supra, *270; see id., *264 (''[l]itigation is the bread and butter of liability insurance companies and they are comfortable with it''). In 2005, ''[t]he insurance industry . . . admitted that it [spent] one billion dollars a year in so-called 'coverage litigation' '' in the property and casualty field alone. Id., *265 and n.32. Even with these enormous expenditures, insurance companies can profit by engaging in dilatory litigation tactics because ''insurance companies earn investment income—a profit— during an insurance coverage dispute with a policyholder. This is done by continuing to invest the policyholder's premiums and the reserves for the duration of the dispute.'' Id., *270. ''If its investments have been good, it may even have made enough to cover any prejudgment interest, costs, or consequential damage[s] award, or counsel fees collected by the policyholder.'' (Internal quotation marks omitted.) Id., *272. This systemic imbalance ''allow[s] insurance companies to wage wars of attrition against individual policyholders who litigate an insurance dispute once in a lifetime.''[23] Id., *270. Even if

and is subject to its disciplinary oversight. Fourth and finally, insurance companies are in the business of litigation, *whereas insureds are not*, which I believe is one of the primary reasons that the law imposes a common-law and statutory duty of good faith in connection with, among other things, an insurance company's litigation related conduct. At least when the system is working properly and each side is represented by counsel, no comparable imbalance exists with respect to litigation attorneys, because each party has one. At the very least, even an unrepresented party knows that it is not ''in good hands'' when relying on opposing counsel.

[23] As the court in *Poling* v. *Motorists Mutual Ins. Co.*, supra, 192 W. Va. 46, stated, ''[o]ften in lawsuits, there is a disparity of bargaining power between the plaintiff and [the] defendant. In most cases, the defendant has a resource advantage over the plaintiff and is able to draw out a trial into a prolonged blizzard of mindless motions, countless continuances, and dreadful delay.

''The mere fact that after months of delay and hassle the insurance company deigns to speak to the injured party and settles the case for the policy limits after realizing that the plaintiff is not going to accept some outlandish

Dorfman *v.* Smith

an insurance company occasionally loses money in a particular case, the system ensures that insurance companies will profit from a general practice of using litigation to coerce lowball settlements and, if that is not possible, to delay payment as long as possible.

In light of the foregoing, members of this court— properly briefed by the parties in a case raising the issues squarely, as the present case does not—may well conclude that public policy weighs in favor of the conclusion that the litigation privilege does not bar CUIPA/ CUTPA claims based on systematic litigation conduct by an insurance company in furtherance of an unfair claim settlement practice. If the litigation privilege does not bar abuse of process claims or bad faith claims based on litigation conduct in an individual case, there is indeed a very strong argument that the systematic abuse of litigation procedures as a general business practice in violation of CUTPA should not be subject to the privilege. Perhaps it would make far better sense to hold that the privilege should be limited to its historic application to defamation claims and causes of action that are similar to that tort, i.e., those based on false statements made during the litigation that are not part of a systemic business practice prohibited by law. Public policy surely does not weigh in favor of extending the privilege to systematic litigation conduct in clear violation of the law; cf. *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 170, 757 A.2d 14 (2000) (" 'we exclude from the [attorney-client] privilege communications made in furtherance of crime or fraud because the costs to truth-seeking outweigh the justice-enhancing effects of complete and candid attorney-client conversations' "), quoting *In re Grand Jury Proceedings*, 183 F.3d 71, 76–77 (1st Cir. 1999); and it is

[lowball] offer, does not automatically preclude the plaintiff from later bringing a bad faith action that includes a request for punitive damages." (Internal quotation marks omitted.) Id., 48.

unreasonable to assume that the legislature intended otherwise merely because it failed to expressly exempt CUTPA claims from the privilege. I therefore disagree with the majority's dictum to the extent that it suggests that the litigation privilege would bar all CUTPA claims based on conduct during litigation.

I agree, however, that the plaintiff in the present case did not adequately allege a CUTPA claim. Accordingly, I concur in part IV of the majority opinion, in which the majority concludes that the trial court properly dismissed that claim.